674 A.2d 106

HARTFORD ACCIDENT AND INDEMNITY COMPANY

v.

SCARLETT HARBOR ASSOCIATES LIMITED
PARTNERSHIP, et al.

SCARLETT PLACE RESIDENTIAL CONDOMINIUM, INC.

v.

SCARLETT HARBOR ASSOCIATES LIMITED
PARTNERSHIP, et al.

No. 619, Sept. Term, 1995.

Court of Special Appeals of Maryland.

April 3, 1996.

218

220

222

224

226

228

Gregory L. Vangeison, Baltimore (T. Michael Preston and Anderson, Coe & King, on the brief, for appellant, Hartford).

Melvin J. Sykes, Baltimore (David P. Sutton and Andrew L. Hartman, on the brief, for appellant, Scarlett Place Residential Condominium, Inc.).

Kenneth F. Spence, III, Towson (Kevin J. Pascale, Susan H. Snively and Miles & Stockbridge, on the brief, for appellees, Scarlett Harbor and The Merritt Operations).

(H. Patrick Donohue and Armstrong, Donohue & Ceppos, Rockville, Chartered, on the brief, for appellee, Security Masonry, Inc.).

(Michael P. May and Gallagher, May & Burgyone, Baltimore, on the brief, for appellees, Leo D'Aleo and William Meyers).

Argued before WENNER, FISCHER and HOLLANDER, JJ.

HOLLANDER, Judge.

This legal morass began with a complaint alleging defective design and construction of a high-rise condominium in downtown Baltimore known as Scarlett Place Residential Condominium ("Scarlett Place" or "Condominium"). Scarlett Place Residential Condominium, Inc., appellant and cross-appellee, is the council of unit owners of the Condominium ("the Council"), established pursuant to Md.Code (1974, 1996 Repl.Vol.), § 11–109 of the Real Property Article ("R.P.") and the Condominium's Declaration and By–Laws. Charged with governing the affairs of the Condominium, the Council filed suit in the Circuit Court for Baltimore County, seeking damages for defects in the common areas of Scarlett Place. The Council sued the developer, Scarlett Harbor Associates Limited Partnership ("SHALP"), its general partners, Leroy Merritt and Merritt Operations Corporation ("MOC"), and its former general partners, William Meyers, II and Leo J. D'Aleo, who are all appellees, asserting breach of the statutory implied warranty, breach of express warranty, breach of contract, and violation of the Maryland Consumer Protection Act. Thereafter, SHALP, Merritt, and MOC (hereinafter, the "Defendants") impleaded several other entities, including the masonry subcontractor, Security Masonry, Inc. ("Security"), Leonard A. Kraus, Inc. ("Kraus"), another subcontractor, and Hartford Accident and Indemnity Co. ("Hartford"), which had issued a performance bond for Kraus.[1] Hartford is an appellant, both Hartford and Security are cross-appellees, and the Defendants are also cross-appellants.

---

1. The Defendants impleaded seven other third-party defendants, who are not involved in the appeal. They are: Turner Construction Co., the successor to Transcon, the construction manager; D'Aleo, Inc., the successor to the architect, Meyers & D'Aleo; AVM Mechanical, Inc., the mechanical contractor; Fidelity & Deposit Co. of Maryland, a surety for AVM Mechanical; American Testing and Engineering Corp., a testing agency; and Churchill Underwriters, Ltd. and North American Financial Services, Inc., both of which were involved in helping to obtain a surety bond for Security.

Aggrieved by the circuit court's various rulings, the Council appeals and presents a plethora of issues for our consideration:

I. Did the court below err in holding that Count IV of the Complaint failed to state a claim under the Maryland Consumer Protection Act?

II. Did the court below err in holding Plaintiff's Breach of Contract claim barred by limitations?

III. Did the court below err in holding that Count II of the Complaint insufficiently alleged breach of express warranty and in refusing to allow a clarifying amendment?

IV. Did the court below err in granting summary judgment for SHALP as to the defective flashing on the ground of limitations?

V. Did the court below err in its rulings with regard to expert testimony and granting summary judgment for SHALP on a claim which was not contested by SHALP's motion?

 A. Did the court improperly preclude testimony of Plaintiff's expert engineer, Gerald A. Dalrymple?

 B. Did the court err in holding that expert testimony was required to establish liability for obvious construction defects, including elevator shaft heating, flooding of the surrounding area of the lobby entry, and excessive noise and vibration on the 14th floor?

 C. Did the court below err in granting summary judgment for SHALP on Plaintiff's claim for failure to install telephones and cables pursuant to contract and for associated consulting fees, when SHALP had not moved for summary judgment as to this claim?

VI. Did the court below err in ruling that Plaintiff lacked a sufficient ownership interest to complain of defects in the Plaza Deck?

VII. Did the court below err in dismissing the Complaint against SHALP's general partners as premature?

The Defendants noted a cross-appeal and present two issues for our consideration:

I. Whether the trial court erred in failing to dismiss the Complaint as being time barred by the applicable statute of limitations?

II. Whether the trial court erred in certain of its rulings on motions for summary judgment filed by Hartford and Security Masonry?

Finally, Hartford appeals the circuit court's denial of its motion to compel submission to arbitration of the third-party claim against it.[2]

## FACTUAL SUMMARY

The Scarlett Place complex consists of three separate condominium regimes: the Residential Condominium (the Condominium), the Commercial Condominium, and the Parking Condominium. The Condominium is a fourteen story residential building with almost 150 units. SHALP, as developer of the Condominium, sold the first Condominium unit in December 1987. In connection with SHALP's sales, buyers signed a "Purchase Agreement," executed under seal. In its "Explanatory Statement," the agreement stated that SHALP "has or proposes to construct . . . a multistory multiple family residential housing project in substantial conformity to the Plans and Specifications prepared by Meyers & D'Aleo, Inc., Architects and Engineers." The "General Provisions" of the Purchase Agreement further provided: "The Residential Condominium, the Garage Condominium and Unit Purchased have been or shall be constructed by Seller in a good and workmanlike manner in substantial conformity with the Residential and Garage Plans and Specifications. . . . "

Sales of Condominium units were slow; by March 1989, only forty units had been sold. Consequently, on March 12, 1989,

---

2. The parties refer to the Council's appeal and the Defendants' cross-appeal as "Appeal No. 2." For convenience, we shall do the same. The parties have called Hartford's appeal "Appeal No. 1," apparently because Hartford noted its appeal first.

ninety-five units were sold at auction. Similar to the pre-auction agreements, the Explanatory Statement in the post-auction purchase agreements contained a statement that SHALP "has constructed ... a multistory multiple family residential housing project in substantial conformity to the Plans and Specifications prepared by Meyers & D'Aleo, Inc., Architects and Planners." For all but two of the units sold at or subsequent to the auction, the post-auction purchase agreements also provided, in pertinent part: "SELLER HEREBY SELLS AND WILL CONVEY SUCH CONDOMINIUM UNIT(S) IN THEIR PRESENT CONDITION, EXCEPT AS SPECIFICALLY MANDATED UNDER MARYLAND LAW." (Capitalization in original).

The post-auction purchase agreements also stated in Paragraph 20.1.1: "Seller will correct any defects in materials or workmanship in the construction of walls, ceilings, floors, and heating and air conditioning systems in the Unit." Further, Paragraph 20.2 provided: "In addition to the warranties set forth in [R.P.] § 10–203 ... Seller warrants the roof, foundation, external and supporting walls, mechanical, electrical and plumbing systems and other structural elements of the common elements." Moreover, Paragraph 20.2.1 stated: "With regard to the implied warranty on common elements [provided by R.P. § 11–131(c) ], Seller shall be responsible for correcting any defect in materials or workmanship, and ... the specified common elements are within acceptable industry standards in effect when the building was constructed."

The Council contends that, after Scarlett Place opened, it discovered various alleged defects, including the following:

(1) The flashing, a waterproofing component, was not installed in accordance with plans and specifications or in a workmanlike manner, resulting in improper diversion of water. Instead of extending beyond the exterior of the brick facade of the building, the flashing was "cut short," causing leaks around the windows in common areas and the corrosion of structural supports such as steel shelf angles. The Council originally believed, however, that the problem of water and

moisture in the vicinity of exterior Condominium windows resulted from "window leaks." Shortly before it filed suit, the Council discovered that the problem actually involved defective flashing.

(2) The frames for the doors to the "trash rooms" were either damaged or improperly installed. As a result, the doors would not close completely, thus causing a fire hazard.

(3) The heating system in an elevator shaft was ineffective, causing the elevator to bring cold air into the area occupied by the residential units.

(4) Improper design of a "Plaza Deck" area resulted in drainage problems and the ponding of water on the deck. In addition, the freezing and thawing of water on the deck caused cracks and threatened the deck's structural integrity.

(5) Defective design of the swimming pool deck caused water to pond on the deck, resulting in the buckling, cracking, and lifting of tiles.

(6) A telephone console system was defective and, furthermore, some units were never supplied with telephones.

(7) A card key entry system for the building was nonfunctional, and the Council had to expend funds to replace it.

(8) The Council had to spend approximately $19,000 to repair damage to the interior brass work and flooring of four elevators, caused by SHALP's contractors.

(9) A "stairway pressurization" system intended to remove smoke from stairwells during a fire did not meet building code requirements.

(10) The HVAC (heating, ventilation, and air conditioning) system had been improperly designed and installed, causing excessive noise and vibration.

(11) Improper sloping of an area outside the front lobby entrance caused water to pond and sometimes caused flooding

in the Condominium lobby.[3]

After the Council notified SHALP of the defects, the parties began to negotiate in an effort to resolve the issues. To give themselves additional time in which to address the concerns, the Council and SHALP, through its general partner, Leroy Merritt, executed a Tolling Agreement on January 10, 1992. It extended, for certain specifically enumerated defects, the limitations period with respect to breach of the statutory implied warranty on common elements. *See* R.P. § 11–131(c)(4). Pursuant to the Tolling Agreement, the Council waived "for all time" its right to sue for breach of implied warranty for defects that were not specifically mentioned. The Tolling Agreement extended the limitations period until January 15, 1993. That date turned out to fall on the Martin Luther King, Jr. holiday, for which the courts were closed.

On January 18, 1993, the first business day after the holiday, the Council filed suit, seeking damages in excess of $5,000,000 for the alleged defects. The Council claimed that the defects resulted from "deficiencies in design of the Condominium," "defects in ... construction," and "departures from plans and specifications." In Count I, the Council alleged a breach of the "implied warranty" regarding common elements, provided by R.P. § 11–131. Count II alleged breach of express warranty. In Count III, the Council alleged breach of contract with respect to the Purchase Agreements. Count IV alleged violations of the Maryland Consumer Protection Act ("C.P.A."), Md.Code Ann., Comm.Law II ("C.L.") § 13–301 *et seq.* (1990).

### Proceedings in the Circuit Court

SHALP filed a motion to dismiss the complaint, asserting, *inter alia,* that the Council's claim for breach of implied warranty was barred by limitations, because suit was filed

---

**3.** The Council also complained to SHALP about leaks in and around the seams and pipes of a cooling tower, and contended that a security system for the building was non-operational. It abandoned these claims during the course of the lawsuit.

after the date of the extension provided by the Tolling Agreement. The court denied the motion.

Kraus and Hartford, two of the third-party defendants, each filed "Petitions to Compel Arbitration and to Stay Proceedings." Relying on a clause in SHALP's contract with Kraus that provided for arbitration of all claims or disputes, they sought an order requiring SHALP to submit its grievance to arbitration. The court granted Kraus's petition but denied Hartford's petition.

The Defendants also filed various motions to dismiss and for summary judgment. On August 15, 1994, the Defendants moved for partial summary judgment on the Council's claim regarding defects in the Plaza Deck, contending that the Council had no property interest in the Plaza Deck, and thus lacked standing to raise complaints about the area. The circuit court granted the Defendants' motion; it declined to consider documents that the Council had attached to its opposition, because they were neither under affidavit nor self-authenticating.

On October 3, 1994, the Defendants moved for partial summary judgment with respect to other specified defects. On November 29, 1994, because the Council lacked expert testimony, the trial court granted summary judgment as to the Council's claim of a defective heating system in the elevator shafts, its claim of improper grading in front of the Condominium's front entrance that allegedly resulted in the pooling of water, and its claim of excessive noise and vibration from the HVAC system.

The court also granted summary judgment on the entire telephone console claim, finding that the claim was abandoned. In addition, the court granted the Defendants' motion with respect to holes and tears in the flashing that caused water to leak into Scarlett Place. But it denied the motion with respect to the claim alleging that the holes or tears in the flashing caused rusting and corrosion of structural steel.

On October 25, 1994, the Defendants moved for summary judgment on the Council's remaining claims. After a hearing,

the court granted the motion as to Counts II, III, and IV and, in part, as to Count I. With respect to the breach of implied warranty claim in Count I, the court held that it created certain triable issues. In its construction of the term "exterior window leaks," used in the Tolling Agreement, the court held that it did not include leaks through the masonry.

The Court dismissed Count III, the breach of contract claim, because it said the allegations constituted only a claim for breach of express warranty. The court also disposed of Count II, the breach of express warranty claim, because it found that the Council only alleged that the Defendants had breached an express warranty that the common elements were built "within acceptable industry standards," and the Defendants never made such a warranty. Thereafter, the court denied the Council's oral motion to amend to include an allegation of an express warranty that the Condominium would be built in accordance with plans and specifications. The court also determined that the CPA claim in Count IV was not actionable.

Security and Hartford each moved for summary judgment in connection with the third-party complaint. The court dismissed the claim against Security for indemnity and contribution and granted summary judgment in its favor as to claims involving "flashing," "weep holes," "flashing tears," "mortar fouling," and "mortar tooling," on the ground that the Defendants had failed to present evidence that Security's work was defective or that any defective work caused water infiltration problems. The court denied Security's motion, however, with respect to the Defendants' claims for "breach of contract" and "professional negligence." The court also partially granted Hartford's motion, rejecting all of the Defendants' claims except those related to the alleged failure of Kraus, Hartford's principal, to create so-called "end dams" in the course of its installation of vinyl flashing.

During the hearings, the court made two additional rulings that are relevant here. First, the court granted the motion of the Defendants and Security to strike the affidavit of Gerald

A. Dalrymple, an engineer retained by the Council, and to bar Dalrymple from testifying on matters included in his report of November 2, 1994. Second, the court dismissed the Council's claims against Merritt, MOC, D'Aleo, and Meyers, the current and former general partners. The court ruled that a plaintiff cannot sue the partners of a partnership until it has obtained a judgment against the partnership itself and exhausts the partnership assets in its collection of the judgment.

### *Summary of Trial Court's Rulings*

At the outset, we commend the trial judge for his Herculean efforts in wading through the morass of legal and factual questions raised by the various parties. The court ruled as follows:

(1) The court rejected the Defendants' contention that, because suit was filed after the expiration of the Tolling Agreement, the Council's implied warranty claim was barred by limitations.

(2) The court entered summary judgment in favor of the Defendants on the Council's claims for breach of express warranty, breach of contract, and violation of the CPA. It also denied the Council's motion to amend its express warranty claim.

(3) The court ruled that the Council's implied warranty claim with respect to water leaks through the masonry (allegedly caused, at least in part, by defective flashing) was barred by limitations, because masonry leaks were not encompassed in the term "exterior window leaks," as used in the Tolling Agreement.

(4) The court struck an affidavit and excluded certain testimony from Gerald Dalrymple, an expert for the Council.

(5) The court entered summary judgment against the Council on its claims regarding the elevator shaft heating system, the ponding near the front lobby entrance, and the HVAC apparatus.

(6) Summary judgment was granted against the Council on its entire telephone console claim.

(7) The court entered summary judgment against the Council on its claim for defects in the Plaza Deck, finding that there was no genuine issue as to whether the Council had standing to seek redress for the defects.

(8) The court dismissed the Council's claims against SHALP's general partners.

(9) The court granted Security's motion for summary judgment in connection with the Defendants' claims for indemnity and contribution, and also on five specified "defective work" claims.

(10) The court granted Hartford's motion for summary judgment on all matters except those relating to the failure of Kraus, Hartford's principal, to install "end dams" during its installation of the flashing.

(11) The court denied Hartford's petition to stay proceedings against it and to compel arbitration.

(12) The court held that the Council's claim for breach of implied warranty presented certain triable issues.[4]

In view of the many issues presented, we shall summarize our holdings.

### Appeal No. 2

### Summary of Holdings As To Council's Claims

(I) The trial court erred in granting summary judgment with respect to the Council's CPA claim.

---

4. The Council and SHALP later settled the issues that had not been resolved by summary judgment. On February 10, 1995, the Council and SHALP executed a "Partial Settlement and Release Agreement" on these issues. The Council, SHALP, Security, and Hartford subsequently filed a joint stipulation and notice of dismissal as to these claims, which specifically provided that it was without prejudice to any party's rights to appeal any prior rulings of the court. Final judgment was subsequently entered, and these appeals followed.

(II) The trial court did not err in entering summary judgment on the Council's breach of contract claim.

(III) The court abused its discretion in refusing to allow the Council to amend its warranty claim. Therefore, we need not decide whether the complaint sufficiently alleged an express warranty that the Condominium would be constructed in accordance with plans and specifications.

(IV) We conclude that the implied warranty claim was untimely filed. Therefore, we decline to reach the Council's contention concerning the construction of the term "exterior window leaks" used in the Tolling Agreement.

(V)(A) Because we shall remand for further proceedings, we need not address the court's decision barring the testimony of the Council's expert.

(V)(B) The trial court did not err in requiring expert testimony to prove defects with respect to elevator shaft heating and the ponding of water near the Condominium entrance. The court did err, however, in requiring expert testimony to prove a defect with respect to excessive noise and vibration from the HVAC system.

(V)(C) The trial court erred in granting summary judgment concerning the Council's entire telephone console claim.

(VI) The trial court erred in refusing to consider a notarized document offered by the Council with respect to the Plaza Deck claim.

(VII) The court erred in dismissing the Council's claims against SHALP's general partners.

### Summary of Holdings on Cross–Appeal

(I) Although the Council untimely filed its complaint with respect to the implied warranty claim, its other claims are not time-barred.

(II)(A) The trial court erred in entering summary judgment in favor of Security regarding the Defendants' indemnification and contribution claims.

(II)(B) The trial court erred in entering summary judgment in favor of Security concerning the Defendants' five "defective work" claims.

(II)(C) The trial court erred in entering summary judgment in favor of Hartford with respect to the claim of defective flashing.

### Appeal No. 1

The trial court correctly denied Hartford's petition to compel arbitration.

### DISCUSSION

### Appeal No. 2 [5]

**I. The Maryland Consumer Protection Act Claim (Count IV)**

At the hearing on December 2, 1994, the court first considered Count IV, in which the Council claimed violations of the CPA. The Council alleged, *inter alia*, that the Defendants had falsely represented to the unit purchasers that the Condominium "would conform to the descriptions in the plans and specifications." [6] Construing C.L. § 13–301(2)(i), which pro-

---

5. We consider Appeal No. 2 first because, if we were to affirm the judgment of the circuit court in Appeal No. 2, it would be unnecessary for us to consider Appeal No. 1. Council who argued the appeal for the Council did not participate in the proceedings below.

6. Count IV also alleged that the defendants had falsely represented that they would make necessary repairs to defects in the common elements caused by faulty workmanship and that the Condominium "would be free from defects and constructed in a workmanlike manner and in accordance with applicable building and safety codes within acceptable industry standards in effect when the Condominium was constructed." Complaint, ¶ 35. The Council, however, did not cite these allegations in its response to the motion for summary judgment or at the hearing. Therefore, we do not pass upon the question of how the Act would apply to those types of false or misleading statements.

In its complaint and in a footnote in its brief, the Council also alleged that the Defendants' misrepresentations violated C.L. § 13–301(2)(iv), which prohibits representations that consumer realty "are of a particular standard, quality, [or] grade ... which they are not." At the

hibits representations that "consumer realty ... [has] a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which [it does] not have," the court held that conformity with plans and specifications is not a "characteristic" of the Condominium within the meaning of the statute and, therefore, the alleged failure to conform to the plans and specifications was not actionable.

■ According to the court, it did not "know how this fits into the Consumer Protection Act." [7] We believe that the court erred in its construction of the term "characteristic." We explain.

The CPA was enacted, in part, because of the General Assembly's determination "that consumer protection is one of the major issues confronting all levels of government, and [due to] mounting concern over the increase of deceptive practices in connection with sales of merchandise, *real property*, and services and the extension of credit." C.L. § 13–102(a)(1) (emphasis added). Consequently, the Legislature sought to "take strong protective and preventive steps to investigate

---

hearing in the circuit court, when the judge asked the Council's attorney for the provisions of C.L. § 13–301 on which he relied, he only cited §§ 13–301(1) and 13–301(2)(i). Nor does the Council argue that the Defendants' conduct violated C.L. § 13–301(9)(i), which prohibits "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with [¶] [t]he promotion of sale of any consumer goods, consumer realty, or consumer service." Therefore, we do not address C.L. §§ 13–301(2)(iv) and 13–301(9)(i).

7. We observe that the ground on which the court ruled was not one of the reasons that the Defendants had offered in support of summary judgment. Instead, the Defendants argued that, because the Council's allegations regarding representations made by SHALP were factually inaccurate, the Council had failed to allege damages that were recoverable under the CPA. They also asserted that there was no evidence that the Defendants had knowledge of the alleged defects at the time title was transferred. Additionally, the Defendants raised limitations, but the circuit court did not base its decision on that ground. Ordinarily, we do not affirm a summary judgment on a ground on which the lower court did not rely. *Warner v. German*, 100 Md.App. 512, 517, 642 A.2d 239 (1994). Therefore, we shall not consider the merits of these claims.

unlawful consumer practices, to assist the public in obtaining relief from those practices, and to prevent these practices from occurring in Maryland." C.L. § 13–102(b)(3). Further, C.L. § 13–105 provides that the Act "shall be construed and applied liberally to promote its purpose."

C.L. § 13–303(1) prohibits "unfair or deceptive trade practices" in the sale of consumer goods, consumer realty, or consumer services. C.L. § 13–301, which provides a nonexclusive list of "unfair and deceptive trade practices," states, in pertinent part:

Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual depiction, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have:

\* \* \* \* \* \*

(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not[.]

C.L. § 13–408(a) creates a civil cause of action for damages resulting from practices prohibited by the Act.

■ A misrepresentation is within the purview of C.L. § 13–301(1) if it is "false" or "misleading" and "has the capacity, tendency, or effect of deceiving or misleading consumers." The Council alleged that the Purchase Agreements falsely stated that the Condominium would conform to plans and specifications. We cannot say, as a matter of undisputed, material fact, that the alleged misrepresentation does not have the capacity to mislead consumers. Therefore, the Council alleged a misrepresentation within the purview of C.L. § 13–301(1).

█■■ Moreover, C.L. § 13–301(2)(i) prohibits a representation that "consumer realty . . . [has] a . . . characteristic . . . which [it does] not have." We disagree with the circuit court's view that conformity to plans and specifications does not constitute a "characteristic" of the Condominium. In construing C.L. § 13–301(2)(i), we follow the well settled rule that the words of a statute should be assigned their natural and ordinary meanings, absent evidence that a contrary interpretation is warranted. *See Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994); *Comptroller of the Treasury v. Jameson,* 332 Md. 723, 732–33, 633 A.2d 93 (1993); *Chesapeake Indus. Leasing Co. v. Comptroller of the Treasury,* 331 Md. 428, 440, 628 A.2d 234 (1993); *Fairbanks v. McCarter,* 330 Md. 39, 46, 622 A.2d 121 (1993); *Williams v. State,* 329 Md. 1, 15, 616 A.2d 1275 (1992); *Reisch v. State,* 107 Md.App. 464, 480, 668 A.2d 970 (1995). *See also Department of Economic and Employment Development v. Taylor,* 108 Md.App. 250, 266–67, 671 A.2d 523 (1996).

"Characteristic" has been defined as a "distinguishing feature or attribute." THE AMERICAN HERITAGE DICTIONARY 117 (1983). *See also* NEW RIVERSIDE UNIVERSITY DICTIONARY 249 (1994) (a "distinguishing attribute or element"). Since conformity to plans and specifications is an attribute or descriptive aspect of a condominium, a seller's statement that the building or unit so conforms is a representation that the condominium has a particular "characteristic."

We find support for this conclusion in the case law of this State and elsewhere. In *Golt v. Phillips,* 308 Md. 1, 517 A.2d 328 (1986), the Court held that the advertisement and renting of an unlicensed dwelling constituted a representation that the dwelling had a "sponsorship," "approval," or "characteristic" that it did not have. *Id.,* 308 Md. at 9–10, 517 A.2d 328. Having a valid license was thus deemed to be a characteristic of rented property. In *Ridco, Inc. v. Sexton,* 623 S.W.2d 792 (Tex.Ct.App.1981), the court, construing a provision of the Texas Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. § 17.46(b)(5), that is almost identical to C.L. § 13–301(2)(i), affirmed an award of damages against defendants

who had falsely represented that they would construct a townhouse "in a good and workmanlike manner" and use the "best materials available." *Id.*, 623 S.W.2d at 794–96. In *Caldwell v. Pop's Homes, Inc.*, 54 Or.App. 104, 634 P.2d 471 (1981), the court held that the selling of a mobile home without informing the buyer of the impending sale of the park where the home was located, requiring the home to be moved, constituted a misrepresentation as to a "characteristic" of the mobile home. *Id.*, 634 P.2d at 475.

In this case, conformity to plans and specifications is as much a "characteristic" of real property as the possession of a valid license or construction with the "best materials available." To conclude otherwise would subvert the CPA's remedial policy of protecting the public against deceptive commercial practices. Accordingly, we hold that the circuit court erred in granting summary judgment as to Count IV.

## II. The Breach of Contract Claim (Count III)

The trial court next considered Count III. It held that the Council's allegations did not constitute a claim for breach of contract. Rather, the Court said the Council alleged only a breach of warranty claim.[8] The following colloquy is relevant:

> THE COURT: How could there be a breach of contract as opposed to warranty? What is the breach of contract separate and apart from warranty?
>
> [THE COUNCIL'S ATTORNEY]: Your Honor, it seems they can be characterized as both. If they make a representation in a contractual setting, they have contractually obligated themselves to fulfill that contractual responsibility.
>
> THE COURT: No. That part of the contract by what they do is either a warranty or a breach of contract and the law has said that it is to be a warranty.
>
> \* \* \* \* \* \*

---

8. The Council claims that the court found that the breach of contract count "functionally duplicated" its express warranty claim in Count II, and thus was barred under the special limitations period for express warranty claims provided in R.P. § 10–204. Our review of the record, however, does not reveal that this was the basis for the court's decision.

When you have a contract that is a contract to sell, any part of that contract which relates to quantity or quality or any other affirmation of fact is a warranty. The only thing you are talking about here is a warranty. I can't see how the warranty count can be separate and apart from a breach of contract count.

\* \* \* \* \* \*

It is a warranty. Out.

In sum, the Council alleged three contractual obligations in the Purchase Agreements that it claimed had been breached: (1) the units and parking facilities "would be constructed in accordance with . . . plans and specifications"; (2) SHALP would make "any necessary repairs"; and (3) the Condominium would be constructed "in a workmanlike manner in accordance with acceptable industry standards." In its opposition, the Council asserted a factual dispute concerning the Defendants' breach of the contractual obligation to construct the Condominium in accordance with plans and specifications. Accordingly, the question before us is whether such an allegation gives rise to a breach of contract claim.

The controlling case is *Antigua Condominium Association v. Melba Investors Atlantic, Inc.*, 307 Md. 700, 517 A.2d 75 (1986), which involved a suit by condominium unit owners and their council against the condominium developer and its parent corporation. In essence, the contracts of sale for the condominiums contained three representations: (1) that "[t]he building . . . conforms substantially to the construction plans and specification . . ."; (2) that the unit being sold "has been or is being constructed substantially in accordance with the construction evidence [sic] that Seller has fully complied with all its obligations . . ."; and (3) the seller would make any repairs that were needed due to faulty construction, material, manufacture, or installation. *Id.*, 307 Md. at 708, 517 A.2d 75.

The central issue in *Antigua* was whether the plaintiffs' claims were barred by limitations. The Court of Appeals approached the problem by dividing the contract clauses into two groups. It viewed the promise to repair as a contractual

obligation, governed by the three-year statute of limitations in Md.Code (1974, 1995 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article ("C.J."). *Id.,* 307 Md. at 711–22, 517 A.2d 75. The court described the other two promises, however, as "no more than an express warranty." *Id.,* 307 Md. at 727, 517 A.2d 75. Therefore, an action for their breach would be governed by the special statute of limitations in R.P. § 10–204(d) for actions for breach of express warranty. *Id.,* 307 Md. at 726–27, 517 A.2d 75. Relying on R.P. § 10–202(a)(1), the Court reasoned that the first two promises were express warranties because they were a "written . . . promise which relates to the improvement and is made a part of the basis of the bargain between the vendor and the purchaser [which] creates an express warranty that the improvement conforms to the . . . promise." *Id.,* 307 Md. at 727, 517 A.2d 75.

*Antigua* suggests that a promise by a developer in a sales contract to do an act in the future is a contractual obligation, but a statement in the contract that assures the quality, description, or performance of the property constitutes an express warranty. *See id.,* 307 Md. at 715, 517 A.2d 75 ("We do not interpret the [promise to repair] as simply a warranty of the condition of the unit or of the common elements as of the time of closing with a Unit Owner"). *See also* BLACK'S LAW DICTIONARY 1587 (6th ed. 1990) (defining "express warranty" as a "promise, ancillary to an underlying sales agreement . . . under which the promisor assures the quality, description, or performance of the goods"); *id.* at 1586 (defining "warranty" as "a promise that a proposition of fact is true.").

 Here, the Council alleged in Count III that SHALP promised that the Condominium would be built in accordance with plans and specifications and in a workmanlike manner, and that the developer would make any necessary repairs. Applying *Antigua,* the repair promise is a contractual obligation, but the representations concerning the condition of the premises are express warranties. In its response, the Council did not allege that there was a factual dispute concerning the

alleged breach of the promise to repair. Instead, it only alleged that there was a dispute about SHALP's failure to construct the facility in accordance with plans and specifications. *Antigua* compels the conclusion that the Defendants' promise in this regard was no more than an express warranty, the breach of which does not give rise to an independent breach of contract claim. Therefore, we affirm summary judgment in favor of Defendants on Count III.

### III. The Breach of Express Warranty Claim (Count II)

We next consider the Council's challenge to the court's summary disposition of its express warranty claim. The court rejected the Council's argument that the complaint alleged an express warranty that the common elements would be constructed in accordance with plans and specifications. Rather, the court determined that the complaint alleged only an express warranty that the common elements would be constructed "within acceptable industry standards," but that the Defendants had never actually made such a warranty. When the Council sought to amend its complaint to include, more clearly, a claim of warranty based on the plans and specifications, the court denied its request.

We need not resolve the issue as to the sufficiency of the warranty claim in the complaint. Even if the complaint did not allege that the Defendants had expressly warranted that the common elements would be constructed in accordance with plans and specifications, we agree with the Council that, under the facts of this case, the trial court abused its discretion in not allowing the Council to amend its complaint to clarify or supplement its allegations.

Amendments to pleadings are governed by Rule 2–341. Because the Council offered its proposed amendment four days before the scheduled trial date, it was required under Rule 2–341(b) to obtain either the written consent of the Defendants or leave of court. Rule 2–341(c), however, provides that "[a]mendments shall be freely allowed when justice so permits." Moreover, case law is to the same effect. *See,*

*e.g., Quality Discount Tires, Inc. v. Firestone Tire & Rubber Co.,* 282 Md. 7, 29, 382 A.2d 867 (1978) (amendments to pleadings "should be freely allowed to serve the ends of justice"), *overruled on other grounds, Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 62 n. 9, 485 A.2d 663 (1984). The policy that favors amendments reflects the liberal spirit of the modern rules. Amendments are allowed "so that cases will be tried on their merits rather than upon the niceties of pleading," *Crowe v. Houseworth,* 272 Md. 481, 485, 325 A.2d 592 (1974), and "to prevent the substantial injustice of a cause . . . being defeated by formal slips or slight variances." *Goldstein v. Peninsula Bank,* 41 Md.App. 224, 230, 396 A.2d 542 (1979). *Accord Hall v. Barlow Corp.,* 255 Md. 28, 39–40, 255 A.2d 873 (1969); *Osheroff v. Chestnut Lodge, Inc.,* 62 Md.App. 519, 526, 490 A.2d 720, *cert. denied,* 304 Md. 163, 497 A.2d 1163 (1985); *Gallant v. Board of School Commissioners of Baltimore City,* 28 Md.App. 324, 331, 345 A.2d 448 (1975). *See also Staub v. Staub,* 31 Md.App. 478, 481–82, 356 A.2d 609, *cert. denied,* 278 Md. 735 (1976).

We recognize that whether to grant leave to amend rests within the discretion of the trial court. *Robertson v. Davis,* 271 Md. 708, 710, 319 A.2d 816 (1974); *Mattvidi Associates Ltd. Partnership v. NationsBank of Virginia, N.A.,* 100 Md.App. 71, 83, 639 A.2d 228, *cert. denied,* 336 Md. 277, 647 A.2d 1216 (1994). Nevertheless, a trial court should not grant leave to amend if the amendment would result in prejudice to the opposing party or undue delay. *E.G. Rock, Inc. v. Danly,* 98 Md.App. 411, 428, 633 A.2d 485 (1993); *Wright v. Trotta,* 34 Md.App. 309, 322, 367 A.2d 557 (1976). But neither should the court overlook the principles recognizing that leave to amend "should be generously granted." *Thomas v. Ford Motor Credit Co.,* 48 Md.App. 617, 632, 429 A.2d 277 (1981). Indeed, as we stated in *Gensler v. Korb Roofers, Inc.,* 37 Md.App. 538, 543, 378 A.2d 180 (1977), "amendments to pleadings are to be allowed freely and liberally so long as the operative factual pattern remains essentially the same, and no new cause of action is stated invoking different legal principles." That principle is applicable here.

Count III certainly contained allegations that the Defendants had promised to construct the Condominium units and parking facilities in accordance with plans and specifications. Count IV also contained an allegation that the Defendants had promised to construct the Condominium in accordance with plans and specifications. Count II incorporated by reference the complaint's statement of facts, which contained an assertion of "departures from plans and specifications" in the construction of the Condominium. Thus, the Defendants had ample notice of the contention of a warranty of conformity with plans and specifications and, presumably, were prepared to defend against it. The Council's proposed amendment merely would have re-stated more clearly a factual assertion of which the Defendants were fully aware; Defendants cannot seriously argue that they were in any way surprised by this allegation. Nor have appellees directed us to any prejudice that would have resulted if the amendment had been allowed. To the contrary, neither the operative factual situation nor the legal theory of the case was changed by the proposed amendment.

The Court of Appeals has indicated that it is a "rare situation" in which the granting of leave to amend is not warranted. *See Hall v. Barlow Corp., supra,* 255 Md. at 40–41, 255 A.2d 873. We conclude that this is not one of those cases. In our view, this case falls squarely within the concept that amendments should be freely allowed so that a case is tried on its merits rather than on the niceties of pleading. Because the Council should have been permitted to amend its Complaint, we shall reverse the entry of summary judgment on Count II.

### IV. The Breach of Implied Warranty Claim (Count I)

The circuit court determined that the statute of limitations had expired on the Council's claim for breach of implied warranty as to leaks through the masonry walls. The court found that the term "exterior window leaks," used in the Tolling Agreement, was clear and unambiguous and did not encompass masonry leaks. Thus, it concluded that term

"exterior window leaks" extended the implied warranty limitations period only for leaks through windows, including frames, seams, and the immediately contiguous bricks. Consequently, the court granted summary judgment against the Council on its implied warranty claim for water leaks through the masonry, in the vicinity of the windows, due to defective flashing.

The Council contends that SHALP fraudulently induced the use of the term "exterior window leaks" in the Tolling Agreement. Based on two letters obtained during discovery, the Council asserts that SHALP had actual knowledge that the problem was one of leaks through the masonry, due to defective flashing, and not window leaks. Moreover, it argues that it believed that the problem of water or dampness near the windows resulted from leaks *through the windows,* based on SHALP's conduct in repeatedly caulking the windows in response to complaints. It thus urges that the term "exterior window leaks" should be broadly construed to include water leaks through the masonry, in the vicinity of the windows. Also, in order to effectuate the parties' intent in the Tolling Agreement, and to avoid giving effect to the Defendants' fraud, the Council argues that the Tolling Agreement should be reformed so that the term "exterior window leaks" includes leaks through the masonry.

■ We need not address this issue, based on our resolution of an overlapping issue in the cross-appeal. We hold that, even if the term "exterior window leaks" were construed in the way that the Council urges, the Council's entire implied warranty claim is barred by limitations; the Council filed its complaint three days after the expiration of the time established in the Tolling Agreement.[9]

The implied warranty for common elements is a creature of statute. *See* R.P. § 11–131(c). The limitations period for suits for breach of implied warranty is established by R.P.

---

9. In their cross-appeal, the Defendants contend that the *entire complaint,* in addition to the implied warranty claim, should have been dismissed on the grounds that the complaint was untimely filed. As we shall discuss, *infra,* we disagree with that argument.

§§ 11–131(c)(3) & (d). The complaint averred that the first transfer of title to a unit owner occurred on December 31, 1987. Complaint, ¶ 12. Therefore, according to the complaint, "the warranty extended until December 31, 1990 and suit was to have been filed by December 31, 1991." *Id.*[10] Thereafter, the parties' Tolling Agreement extended until Friday, January 15, 1993 the period in which the Council could file suit for breach of implied warranty.

The courts were closed on January 15, 1993 in observance of a holiday, and the Council did not file its complaint until January 18, 1993, which was the first business day after the holiday. The question before us is whether the Council's implied warranty claim was too late. It contends, based on several grounds, that its suit was timely. We conclude that it was not.

Rule 1–203(a), on which the Council relies, states:

In computing any period of time *prescribed by these rules, by rule or order of court, or by any applicable statute,* . . . [t]he last day of the period so computed is included unless:

(1) it is a Saturday, Sunday, or legal holiday, in which event the period runs until the end of the next day which is not a Saturday, Sunday, or legal holiday. . . .

(Emphasis supplied).[11]

The plain language of Rule 1–203(a) shows that it offers no aid to the Council. The rule only extends periods of time that are prescribed by the rules themselves, by "rule or order of court," or by "any applicable statute," when the last day of the period falls on a weekend or legal holiday. In this case, the January 15, 1993 deadline was not set by a rule, court order, or statute; it was a *contractually* established deadline. More-

---

**10.** The Tolling Agreement actually provided a different date as to the expiration of the limitations period. This discrepancy, however, is of no legal significance.

**11.** We note that Md.Ann.Code, art. 94, § 2 (1995), provides a comparable rule for computing the "period of time prescribed or allowed by any applicable *statute.* . . ." (Emphasis added).

over, Rule 1–203(a) conspicuously does not contain any provision for extending contractually established periods of time when the last day of a contractual period falls on a day when the courts are closed.

The Council also attempts to place this case within the language of Rule 1–203(a) by arguing that the rule tolled limitations until January 18, 1993 and, when the Tolling Agreement expired on January 15, 1993, the limitations *statute* became operative again. This argument, too, is rebutted by the language of the rule. It applies only when the "last day" of the "period of time *prescribed by*" the "applicable statute" falls on a weekend or holiday. (Emphasis supplied). Here, the "last day" of the limitations period "prescribed by" R.P. § 11–131(c)(3) & (d) was December 31, 1991, not January 15, 1993. Thus, Rule 1–203(a) does not apply when the last day of a period of time prescribed by contract falls on a weekend or holiday.

Additionally, the Council argues that the Tolling Agreement "suspended" the statute of limitations and, on January 15, 1993, the statute began running again and was extended by Rule 1–203(a) until the next business day. But the *statute* of limitations period had long since expired by the time the Council filed suit; it expired on or about December 31, 1991. Nor did the Tolling Agreement "suspend" the statute of limitations so that it would suddenly spring to life on January 15, 1993. While the statute of limitations is, in certain instances, "suspended" by statutes, such as the ones tolling the period for minority or insanity, *see* C.J. § 5–201; insolvency, *see* C.J. § 5–202; or fraud, *see* C.J. § 5–203, the Tolling Agreement created the parties' own private, contractually established limitations period. The result of the agreement was that the Council could bring its suit, even though limitations had run, and the Defendants waived their ability to raise limitations as a defense, as long as suit was filed within the contractually authorized period and addressed enumerated defects. *Cf. Chandlee v. Shockley*, 219 Md. 493, 498, 150 A.2d 438 (1959) (time limit in an "ordinary statute of limitations" may be waived). *See generally* 54 C.J.S. *Limitation of Ac-*

*tions* § 25 (1987) ("In the absence of a controlling statute to the contrary, the parties to a lawsuit or a potential lawsuit may, by agreement, modify a statutory period of limitation.")

The Council contends, too, that it "would have made no sense" to have a Tolling Agreement with a termination date on a day when the courts were closed. But the fact that the agreement expired on a court holiday did not prevent the Council from filing suit in advance of that date. The January 15 expiration date thus did not render the agreement meaningless. Although it is probably true, as the Council suggests, that none of the parties realized that the courts would be closed on that date, this harsh fact does not permit us to ignore the unambiguous language of the agreement.

When the language of a contract is clear and unambiguous, a court may not, under the guise of construction, redraft the contract to avoid hardship to the parties. *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 350, 322 A.2d 866 (1974); *Great United Realty Co. v. Lewis*, 203 Md. 442, 450, 101 A.2d 881 (1954); *Hankins v. Public Service Mutual Insurance Co.*, 192 Md. 68, 84, 63 A.2d 606 (1949); *Metropolitan Life Insurance Co. v. Promenade Towers Mutual Housing Corp.*, 84 Md.App. 702, 714, 581 A.2d 846 (1990), *aff'd*, 324 Md. 588, 597 A.2d 1377 (1991); *Stueber v. Arrowhead Farm Estates Limited Partnership*, 69 Md.App. 775, 780, 519 A.2d 816, *cert. denied*, 309 Md. 521, 525 A.2d 636 (1987). Therefore, we cannot re-write a contract in order to remedy the parties' mistake.

Finally, the Council argues that the limitations period was tolled by SHALP's allegedly fraudulent conduct in caulking the windows when it knew that the water problem was caused by defective flashing. We observe that the Council did not affirmatively plead a cause of action for fraud in its complaint. Moreover, in its complaint, under the heading of "Limitations," it explains its reasons as to why its claims were timely filed; the Defendants' fraud is not mentioned. Nevertheless, the Council argues here that the Defendants cannot raise the statute of limitations as a defense because the statute was

tolled by the Defendants' fraud. The Council relies on C.J. § 5–203, which reads:

If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.

From our review of the record, it does not appear that the Council argued the applicability below of C.J. § 5–203. The Council did, however, raise the argument that the Tolling Agreement should be *reformed*, as a consequence of the Defendants' fraud, so that the term "exterior window leaks" would include leaks through the masonry.[12] Rule 8–131(a) provides that, ordinarily, we will not decide an issue "unless it *plainly* appears by the record to have been raised in or decided by the trial court." (Emphasis supplied). Accordingly, we will not decide the question here.

For the foregoing reasons, we conclude that the Council's entire breach of implied warranty claim is barred by limitations. Our resolution of this issue makes it unnecessary for us

---

**12.** For example, the Council's attorney made the following arguments to the circuit court:

Our contention is that the category of the exterior window leaks should be interpreted on the circumstances I have set forth in my motion, which circumstances amount to a fraudulent concealment [and] should be considered to include the leaks through the masonry.

\* \* \* \* \* \*

Your Honor, we are contending that the interpretation to exterior window leaks should not be limited in the way that the defendants have suggested it should be limited. That is the reason that the terminology, exterior window leaks, was utilized in this agreement was because Mr. Merritt concealed the fact that there were masonry leaks. He created the impression and interpretation that was adopted by the drafters of this document that exterior window leaks was the problem.

The trial judge also interpreted the Council's arguments as arguing for reformation, and not including any argument under § 5–203. The judge said: "You are asking me to reform on the law side of the document a phrase which I'm not able to do.... The most I can do would be on the equity side, if there, and it is not couched in that framework, sir."

to consider the Defendants' alternative argument that Rule 1–203(a) does not apply to statutes of limitations. It also renders moot the Council's contention that the Tolling Agreement should be reformed so that the term "exterior window leaks" includes leaks as a result of, or through, defective masonry.

## V.

In addition to its challenges to the trial court's rulings on the four counts of its complaint, the Council challenges several specific rulings that do not fit within any particular count. We turn next to these specific issues.

### A. *Gerald Dalrymple's Affidavit and Testimony*

The Council contends that the circuit court abused its discretion in excluding from consideration in the summary judgment proceedings the affidavit or testimony of Gerald A. Dalrymple, the engineer whom the Council had retained as an expert. The affidavit contained opinions regarding conformity to plans and specifications, the failure to install "gable roof counterflashing," and the need for terrace and deck repairs. The trial court concluded that Dalrymple's opinions differed from ones that he had rendered at an earlier deposition, that the new opinions were untimely because they violated the court's scheduling order, and that "considering the complexity of this problem it would be unusual and unexpected that at this late date these people would have to change horses in midstream."

In view of the remand, we decline to address this issue. We assume that, on remand, the court will enter a new scheduling order and that there will be ample time to complete discovery. *Cf. Bartholomee v. Casey,* 103 Md.App. 34, 50–51, 651 A.2d 908 (1994), *cert. denied,* 338 Md. 557, 659 A.2d 1293 (1995) ("Our determination [that the trial court had erroneously admitted evidence not revealed during discovery] does not necessarily preclude admission of the evidence at any retrial, for [the defendant] could no longer claim surprise or prejudice.").

## B. The Requirement of Expert Testimony
## on Certain Specific Defects

The circuit court granted the Defendants' motion for summary judgment for specific alleged construction defects: (1) an ineffective elevator shaft heating system; (2) the ponding of water in the vicinity of the front lobby entrance; and (3) excessive noise and vibration from the HVAC system. Trial was imminent, and the court determined that the Council's failure to procure an expert necessitated summary disposition of the claims.

The Council described each of the claimed defects in a "Summary of Defects, Repairs, and Costs" ("Summary") that it provided during the course of discovery. With regard to the elevator shaft, it claimed, *inter alia,* that "[c]old air travels from the unheated garage up the elevator shaft into the heated hallways of the Condominium." According to the Summary, the problem with the front lobby entrance involved water draining towards the entrance doors, which ponded and occasionally entered the Condominium. Regarding the HVAC system, the Council alleged "constant noise and vibration caused by mechanical apparatus used in the building operation," located above a dwelling unit.

### (1) The Elevator Shaft

The Council contends that the trial court entered summary judgment because the Council lacked expert testimony.[13] In addition to its allegation that SHALP's attempted

---

**13.** The record reveals that the court explicitly addressed only the issue of whether SHALP's unsuccessful attempt to fix the problem constituted an "admission" of the existence of a defect. In its response to the Defendants' motion for summary judgment, the Council offered as evidence of a defect the deposition testimony of Andrew "Skip" Miller, a project manager employed by Merritt, that SHALP had attempted to correct the problem by adding four heat pumps in the elevator shaft. The Council contended that "[t]he mere fact that SHALP attempted to correct the problem[,] and that it was unable to do so, is evidence of a defect sufficient to defeat Plaintiff's [sic] demand for summary judgment." The trial court rejected the Council's contention that this was

remedial measures constituted an admission, the Council argued that "[t]he Defendants have no authority for the proposition that in order to establish the defect an expert witness must be engaged." Instead, the Council offered the affidavit of Lois McCall, a property manager for Scarlett Place, who averred that she "observed on many occasions, in winter months, that cold air rushes into the heated interior of the building from the north elevator shafts which connect the open parking garage to the residential portion of the building," and that "[t]he heat pumps installed by SHALP in the north elevator are completely ineffective." The trial court at least implicitly rejected the Council's contention and the affidavit. To the extent that the court rested its decision on the Council's failure to produce expert testimony of a defect in the elevator shaft heating system, we shall affirm.

"The general rule is well established that expert testimony is only required when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman." *Virgil v. "Kash N' Karry" Service Corp.*, 61 Md.App. 23, 31, 484 A.2d 652 (1984), *cert. denied*, 302 Md. 681, 490 A.2d 719 (1985). Expert testimony is not required, however, on matters of which the jurors would be aware by virtue of common knowledge. *Babylon v. Scruton*, 215 Md. 299, 307, 138 A.2d 375 (1958).

In this case, the Council's claim relates to the proper design of the heating system for an elevator shaft. We do not believe that this is a matter within the knowledge of the average layperson; most jurors would not be sufficiently versed in engineering, physics, or construction to know whether or where to install heat pumps, whether the bottom of the elevator shaft was properly unenclosed, or how to prevent the elevator cab from forcing cold air into the upper portions of the building. *Cf. Raines v. Boltes*, 258 Md. 325, 330–32, 265 A.2d 741 (1970) (question of whether injury was permanent

---

an admission of a defect, ruling that SHALP's actions were only a "customer accommodation." The Council does not contest this ruling.

**258**

required medical expert to justify award of future impairment); *Johns Hopkins Hospital v. Genda,* 255 Md. 616, 258 A.2d 595 (1969) (medical malpractice claim involving the breaking of a suturing needle during surgery required expert testimony); *Craig v. Chenoweth,* 232 Md. 397, 400, 194 A.2d 78 (1963) (causal connection between negligent act and paralysis not provable without expert testimony); *Hooper v. Gill,* 79 Md.App. 437, 441, 557 A.2d 1349, *cert. denied,* 317 Md. 510, 564 A.2d 1182, *cert. denied* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1989) ("Expert testimony is necessary in a legal malpractice case to establish the existence of a breach of a reasonable legal duty, except in that class of cases where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts." [citation and internal quotation marks omitted] ). Based on the evidence that the Council offered, the trier of fact would be left only to speculate as to whether there was a "defect" in the construction or design of the elevator shaft. Accordingly, we conclude that the trial court did not err in requiring the Council to offer expert testimony.

### (2) Ponding Near the Lobby

This claim concerns the grading of the "Columbus Piazza" area in front of the Condominium. McCall stated in her affidavit that the Piazza "is graded in a gradual way towards the front door of the Condominium and the water is not channeled toward the Scarlett building." The court stated: "The fact of the matter is that you have no expert testimony that that lobby, that the water coming into that lobby is coming in due to any defect."

How to grade a paved area properly is not within the ken of the average layperson. The ordinary juror would not know whether the grading here departed from industry standards, or how properly to "channel" water to prevent it from draining toward the building. These matters require the trier of fact to have some knowledge of architecture, construction, or engineering. Because the trier of fact would be left only to

speculate as to whether a defect in construction or design caused the ponding of water, the court did not err.

### (3) The HVAC Claim

██ The Council submitted an affidavit from Howard Castleman, the owner of Condominium Unit 1402, which stated, in pertinent part:

2. My Unit is on the top residential floor of the Condominium building.

3. Above my Unit is a mechanical room which includes heating and air conditioning machinery, pumps, fans and other mechanical apparatus.

4. The noise and vibration from such mechanical devices was transmitted directly from the machines to the concrete floor of the mechanical room into the ceiling and walls of my Condominium Unit.

5. The effect of such vibration and noise *was to render my Unit uninhabitable.* It *interrupted my sleep and was constant, irrepressible annoyance* until the installation of sound isolation pads in August, 1991.

6. The sound isolation pads have largely cured the problem although there is still some evidence of vibration from the mechanical devices above the ceiling of my Condominium Unit.

(Emphasis supplied).

The trial court focused on the absence of expert testimony as a basis for its entry of summary judgment. It asked the Council: "Where is there any type of evidence from an expert that it was due to a defect?"

Many lay persons have lived in apartments or stayed in hotel or motel rooms, and they would know that "constant" loud noise and vibrations from mechanical devices is out of the ordinary. As a matter of common knowledge, the kind of noise and vibration that results in "irrepressible annoyance," "interrupt[s] . . . sleep," and renders a room "uninhabitable," raises at least an inference of defective construction or design. *Cf. Homa v. Friendly Mobile Manor, Inc.,* 93 Md.App. 337,

350–51, 612 A.2d 322 (1992) ("expert testimony is not required where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts" [internal quotation marks omitted] ), *appeal dismissed without opinion,* 330 Md. 318, 624 A.2d 490 (1993). We conclude that the affidavit was sufficient to raise a triable issue, and that expert testimony was not necessary. Therefore, the court erred.

## C. The Telephone Console Claim

The Council contends that the circuit court erred in entering summary judgment with respect to its claim that SHALP failed to install certain telephones and cables. We agree.

In its Summary, the subject of telephones is included under the heading of "Telephone Console." But a review of the text of the claim makes clear that it consists of two components: one alleging that "[t]hirty nine (39) residential units were missing telephones" and cables, and another alleging various "problems" with a telephone switching computer known as "the AT & T System 75 PBX." Moreover, on its "cost breakdown" on the Summary, the Council itemized its telephone claim into two separate portions: $6,151.50 for the thirty-nine missing telephones and cables, and $30,000.00 for the "[i]mproper design and utilization of a System 75 PBX versus a System 25 PBX."

In its "Amended Preliminary Statement of Defendants Regarding Experts and Expert Opinions," which was provided to the Council during discovery, the Defendants stated, "At this time, SHALP has no response to the 39 missing telephones and the cost associated with the installation of those phones and the associated cables." Regarding what the Defendants called "[t]he remaining portion of the claim, $30,000.00 ... claimed to be associated with Plaintiff's contention that SHALP should have provided a System 75 PBX instead of a System 25 PBX", the Defendants stated that they could not respond until the Council advised them when and where

SHALP had represented "that the Condominium would have a state of the art telephone system."

In the Defendants' summary judgment motion, they listed "Telephone Console (Item E)". "Item E", of course, corresponds to the telephone console claim described in the Council's Summary. But, despite the facial broadness of Item E, the defense's arguments in its memorandum addressed only the AT & T System 75 PBX, not the missing 39 telephones. The defense asserted, in pertinent part:

### 3. Telephone Console

The Council's position with respect to this particular defect is remarkable. In effect, the Council is contending that the system supplied by SHALP is *better* than the system SHALP promised to deliver. The Council's claimed "damages" consist of a credit the Council seeks for the difference in the cost of the better system provided and the lesser system which the Council believed would have been sufficient.

> \* \* \* \* \* \*

[T]here is no evidence of a construction or design defect. Summary judgment should therefore be entered in favor of SHALP on this issue.

(Emphasis in original).

Understandably, in response to the Defendants' argument, the Council only addressed the System 75 PBX. It said:

### 3. ITEM 3—TELEPHONE CONSOLE

Plaintiff withdraws that aspect of the claim regarding the telephone console which relates to the difference in price between a System 75 PBX and a System 25 PBX.

At the hearing, when the circuit court observed that the telephone console claim was "not in dispute," the Council's attorney disagreed. He contended that the Defendants had only moved for summary judgment on the System 75 PBX portion of the telephone claim and, in response, the Council had withdrawn that claim. But, the Council strenuously opposed summary judgment on the issue of the thirty-nine

missing telephones and cables. The court said, "[Y]ou produced nothing in summary judgment—they filed a motion for summary judgment with regard to the whole thing. You filed an answer saying you withdrew one aspect. You didn't file an answer with regard to anything else. You are out."

In this Court, the Council reiterates that the trial court improperly entered summary judgment on the entire claim, even though no motion for summary judgment had been made as to the missing telephones. Rule 2–501(e) provides that a court shall enter summary judgment "if the *motion and response* show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." (Emphasis supplied). In addition, Rule 2–501(b) provides that a "response to a motion for summary judgment shall identify with particularity the material facts that are disputed." But the non-moving party is not required to identify the material facts in dispute unless the moving party includes in its motion the facts that are necessary to obtain judgment and shows that there is no dispute as to those facts. *Bond v. NIBCO, Inc.,* 96 Md.App. 127, 136, 623 A.2d 731 (1993). Accordingly, the Council was not required to respond to a matter that was not raised in the motion.

## VI. The Plaza Deck Claim

The Defendants moved for summary judgment regarding the Council's claim for defects in an area known as the "Plaza Deck." They asserted that the Council had no property interest in the area and thus lacked standing to bring this claim. The Defendants attached to their motion an affidavit from a professional land surveyor, Douglas W. DuVal, in which he opined that the deck was owned only by the Commercial and Parking Condominium regimes. The Council responded to the motion, attaching several documents to its response: (1) a photocopy of the Council's articles of incorporation; (2) a photocopy of a "Declaration of Easements, Covenants, Conditions and Restrictions;" (3) a photocopy of a notarized "First Amendment" to that Declaration; and (4) photocopies of sev-

eral plats of the Condominium. Although the Council did not support its response with any affidavits, the photocopied Declaration, its amendment, and some of the plats bore "liber" and "page" stamps indicating that they had been recorded in the Land Records Office. Moreover, the copy of the articles of incorporation included a photocopied receipt from the State Department of Assessments and Taxation (SDAT). None of the photocopies, however, was certified by either the Land Records Office or SDAT.

The circuit court granted the Defendants' motion. It found DuVal's affidavit "sufficient" and refused to consider the documents offered by the Council. It stated that "the Plaintiff's response is not under affidavit and refers to subdivision plats, which are not self-authenticating, to represent what they purport to be, and also to a 'Declaration', which is not included as part of the motion." The Council argues that the court erred, because the documents were admissible and the court's requirement of affidavits for authentication or certifications for self-authentication was a "technicality" not required under the Maryland Rules of Evidence.

We first consider the Defendants' contention, based on Rule 2–501(b), that, irrespective of the admissibility of documents, the Council was required to submit an affidavit. The rule provides, in pertinent part:

> When a motion for summary judgment is supported by an affidavit or other statement under oath, an opposing party who desires to controvert any fact contained in it may not rest solely upon allegations contained in the pleadings, *but shall support the response by an affidavit or other written statement under oath.*

(Emphasis supplied).

An affidavit is not the exclusive way to support a response to a motion for summary judgment. Paul V. Niemeyer & Linda M. Shuett, MARYLAND RULES COMMENTARY 332 (2nd ed. 1992). Instead, a response may be supported by "any type of evidence that is admissible at trial." *Id.* This is but a corollary of the general principle that "the party opposing

summary judgment must present *admissible evidence* demonstrating the existence of a material dispute." *Bagwell v. Peninsula Regional Medical Center,* 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996) (emphasis supplied). Thus, a document, otherwise admissible, may be used to show the existence of a factual dispute.

The parties also debate whether the documents that the Council attached to its response were admissible, standing alone. We need not consider whether the court properly refused to consider the Declaration, amendment and plats. This is because we conclude that the court should have considered the photocopy of the "First Amendment to the Declaration of Easements, Covenants, Conditions and Restrictions." As it was notarized, it was self-authenticated under Rule 5–902(a)(8), which provides that "acknowledged documents" are self-authenticating. The photocopy of the amendment, in turn, was admissible under the exception to the best evidence rule for photographic "duplicates." *See* Rules 5–1001(d), 5–1003.

The amendment indicates that the Condominium granted the Commercial and Parking Condominiums an easement in something called the "Plaza Area." It reads, in pertinent part:

> The Residential Condominium establishes and grants to the Commercial Condominium and the Parking Condominium, an Easement for Access and an Easement for Use for the mutual benefit of the Commercial Parcels and the Garage Parcels, on, over and across Parcel R–6.

"Parcel R–6," according to an earlier paragraph in the amendment, is known as the "Plaza Area." The document thus indicates that the Condominium had a property interest in the Plaza Area; if it had no such interest it would not have been able to grant an easement.

To be sure, the name "Plaza Area" in the amendment is slightly different from the name "Plaza Deck." But the names are so close that a material factual issue may have been raised

concerning whether the Council had a property interest in the Plaza Deck. Therefore, we shall vacate summary judgment in favor of the Defendants on the Council's Plaza Deck claim, and remand for further consideration.

### VII. The Dismissal of the Claims Against SHALP's General Partners

The Council's final contention challenges the circuit court's dismissal of its claims against SHALP's current general partners, Merritt and MOC, and its former general partners, Meyers and D'Aleo. The court determined that a claim against a partnership may only be asserted against the partnership, not the partners themselves, until the plaintiff has obtained a judgment against the partnership and exhausts the partnership's assets. We disagree.

As for the Council's CPA claim, we conclude that the general partners are proper defendants. By analogy, the reasoning in *Phillips v. Cook*, 239 Md. 215, 210 A.2d 743 (1965) offers some guidance. There, the Court of Appeals held that, in a tort action, a partner may be sued along with the partnership "where the claim is based upon an alleged tortious act committed in the course of the partnership business." *Id.* at 223–24, 210 A.2d 743. In our view, a CPA violation is in the nature of a tort action; it is a legal wrong that is not equivalent to a breach of contract. According to the Maryland Law Encyclopedia ("MLE"),

A "tort" is a legal concept possessing the basic elements of a wrong with resultant injury and consequential damage which is cognizable in a court of law.

Although torts have been defined as wrongs independent of contract, where there is such a contract to which are attached duties of a dual character, some with a consensual basis and others imposed by law on the particular relation which the parties have assumed, a breach of the former class of duties only is not tortious, but a breach of the latter class constitutes a tort.

In order to constitute a tort [t]here must be a duty in favor of the person injured and on the person whose conduct produces the injury, conduct constituting a breach of such duty, and damage resulting from the breach of duty, but unless the act or conduct complained of is the proximate cause of the injury there is no legal liability.

As otherwise stated, one commits a tort and becomes liable in damages where he commits some act unauthorized by law, or omits something which by law he ought to do, and by such act or omission either infringes some absolute right of another or causes such other person some substantial loss of money, health, or material comfort, beyond that suffered by the rest of the public.

21 MLE *Torts* §§ 1, 2 at 110–11 (1960).[14] Thus, relying on *Phillips*, we conclude that SHALP's partners are proper defendants to the Council's CPA claim.

For *contractual* claims against partnerships, however, the issue is more unsettled. As the Council views its warranty claims as contractual actions and not tort actions, we shall analyze the issue in that light. In order to answer the question of whether a partner may be sued in a contractual action, along with the partnership, we shall first review statutory and case law pertaining to actions against, and the liabilities of, partners and partnerships.

SHALP is a limited partnership. Merritt and MOC are its general partners and Meyers and D'Aleo were formerly general partners.[15] Under Md.Code (1975, 1993 Repl.Vol.), § 10–403(a) of the Corporations and Associations Article ("C.A."), the general partners of a limited partnership are "subject to the restrictions and liabilities of a partner in a partnership without limited partners." Pursuant to C.A. § 9–307(a), which

---

**14.** In *Abramson v. Reiss*, 334 Md. 193, 204 n. 4, 638 A.2d 743 (1994), the Court of Appeals referred to *McClure v. Johnson*, 50 Ariz. 76, 84–88, 69 P.2d 573, 577–78 (1937), for "an analytical discussion on divining whether an action sounds in tort or in contract."

**15.** Our discussion does not apply to limited partners .of a limited partnership, whose liabilities are governed by different rules.

establishes the nature of a partner's liability, partners are "jointly and severally liable" for torts or breaches of trust committed in the course of partnership business, but are only "jointly liable" for contractual obligations of the partnership. C.A. § 9–307(a) states:

In general.—Except as provided by subsection (b) of this section [pertaining to "limited liability partnerships"], all partners are liable:

(1) Jointly and severally for everything chargeable to the partnership under §§ 9–305 [partnership bound by partner's "wrongful act or omission" in the course of partnership business] and 9–306 [partnership bound by partner's breach of trust]; and

(2) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract.

The differences between the concepts are largely procedural. "Joint liability" exists when two or more parties together are liable to a third party. BLACK'S LAW DICTIONARY 838 (6th ed. 1990). Its special feature is that a joint obligor who is sued has the right to insist that the plaintiff join all co-obligors. Id.; First Interstate Bank of Fargo, N.A. v. Larson, 475 N.W.2d 538, 544 (N.D.1991). If parties are "jointly and severally liable," each is fully responsible for the liability or obligation at issue, but a plaintiff may sue any or all of them in one suit at his or her option. Hardy v. Gulf Oil Corp., 949 F.2d 826, 829 (5th Cir.1992); BLACK'S LAW DICTIONARY, supra, at 837. See Anne Arundel Medical Center, Inc. v. Condon, 102 Md.App. 408, 414, 649 A.2d 1189 (1994), appeal voluntarily dismissed by petitioner, 339 Md. 641, 664 A.2d 885 (1995) ("At common law, an individual injured by the negligence of more than one tortfeasor could proceed against any one for payment of damages recovered"). But all parties who are jointly and severally liable need not be joined in a lawsuit. See Cooper v. Bikle, 334 Md. 608, 619, 640 A.2d 1120 (1994) (joint tortfeasors).

■ These principles found their way into the case law involving suits against partnerships. At common law, an action could not be brought by or against a partnership in the name of the partnership alone. *See Smith v. Crichton,* 33 Md. 103, 106 (1870); 17 MLE *Partnerships* § 151 at 487 (1961). Instead, the partners themselves were proper parties to the case. *See Stewart v. Rogers,* 19 Md. 98, 114 (1862). When a claim against a partnership was contractual in nature, because the liability of the partners was joint, a partner who was sued had the right to require that *all* "non-dormant" partners be joined in the case. *See Smith v. Cooke,* 31 Md. 174, 179 (1869); *Kent v. Holliday,* 17 Md. 387, 392 (1861). *Cf. Hopkins v. Kent,* 17 Md. 72 (1861) (dormant partners did not have to be joined). But where a claim against a partnership sounded in *tort,* because the liability of the partners was joint and several, the plaintiff could, at his or her election, sue one, some, or all of the partners. *See Stockton v. Frey,* 4 Gill 406 (Md.1846). This rule still prevails today. *See Hatzinicolas v. Protopapas,* 314 Md. 340, 343–44, 550 A.2d 947 (1988).

In 1975, the General Assembly, with the enactment of C.J. § 6–406, abolished the prohibition against suing a partnership in the firm name alone. C.J. § 6–406 provides:

(a) An unincorporated association, joint stock company, or other group which has a recognized group name may sue or be sued in the group name on any cause of action affecting the common property, rights, and liabilities of the group.

(b) An action under this section:

(1) Has the same force and effect with respect to the common property, rights, and liabilities of the group as if all members of the group were joined; and

(2) Does not abate because of any change of membership in the group or its dissolution.

The evident effect of the statute is the abrogation of the requirement of joinder of all partners in a contractual action against a partnership. Under subsection (a), a plaintiff may sue a partnership in its "group name," and under subsection (b)(1), an action against a partnership "[h]as the same force

and effect ... as if all members of the group were joined." Thus, a creditor with a contractual claim against the partnership needs only to sue the partnership itself, and no longer has to sue all of the individual partners.

 But we can discern nothing in the statute that evinces the Legislature's intent to alter the principle so that partnership creditors are *prohibited* from suing the partners in the same action in which the creditor sues the partnership. The statute addresses itself to whether an unincorporated association *may* sue or be sued in its group name; it does not say that partners *cannot* be named as defendants in such an action. In fact, the Maryland Uniform Partnership Act, C.A. §§ 9-101 to 9-703, indicates to the contrary. C.A. § 9-307(a)(2) provides that partners are "liable ... [j]ointly" for contractual debts and obligations of the partnership. The unambiguous words of this statute mean exactly what they say; if a partnership incurs a contractual debt, the partners are jointly *"liable"* for it. *See Bennett Heating & Air Conditioning, Inc. v. NationsBank of Maryland,* 103 Md.App. 749, 769, 654 A.2d 949, *cert. granted,* 339 Md. 445, 663 A.2d 1271 (1995); *Montgomery Village Associates v. Mark,* 95 Md.App. 337, 342, 620 A.2d 975, *cert. denied,* 330 Md. 680 (1993). Therefore, we conclude that partners can be sued in the same action in which a partnership obligation is adjudicated. *Accord,* 68 C.J.S. *Partnership* § 209 at 683 (1950) (in action against a firm, it is unnecessary to name the partners as codefendants, but plaintiff may sue all the partners individually; an action may be brought against any of the individual members of the partnership or against the partnership and any of its members); *Tuttle v. Nichols Poultry & Egg Co.,* 240 Iowa 199, 35 N.W.2d 875, 879–80 (1949) (in contract action, partners and partnership were properly sued; "actions may be brought by or against partnerships as such or against any or all partners with or without joining the firm").

 If a judgment is entered against the partners for a partnership liability or obligation, the equitable doctrine of "marshalling of assets" applies to protect the partners' person-

al assets from the claims of the partnership creditor. The doctrine of marshalling provides that partnership assets are applied first to the discharge of partnership liability. *See Glenn v. Gill,* 2 Md. 1, 15 (1852); *McCulloh v. Dashiell's Administrator,* 1 H. & G. 96 (1827). *See also National Union Bank v. National Mechanics' Bank,* 80 Md. 371, 386–87, 30 A. 913 (1895). Thus, a partnership creditor cannot reach the partners' personal assets unless the partnership assets are first exhausted or there is no effective remedy without resort to the individual partners' property. *See* 59A Am.Jur.2d *Partnerships* § 639 at 556 (1987).

In *Seventy–Three Land, Inc. v. Maxlar Partners,* 270 N.J.Super. 332, 637 A.2d 202 (App.Div.1994), the court held that a contract creditor of a partnership may sue the partnership and its general partners in a single action. But, based on the doctrine of marshalling of assets, the court also stated that the creditor could not execute against the partners' personal assets until partnership assets were exhausted. *Id.,* 637 A.2d at 204. As a result, any judgment against the partners would initially be entered as to "liability only" to protect the partners' assets, and would "not be entered as a final judgment for a sum certain until there is proof that the partnership cannot satisfy the judgment." *Id.* at 203, 205. The court reached its decision under New Jersey's Uniform Partnership Act, whose partner liability provision is in all pertinent respects identical to C.A. § 9–307(a).

We do not believe that *Phillips v. Cook, supra,* 239 Md. 215, 210 A.2d 743, on which the Defendants rely, is contrary to our conclusion. In that case, the Court held that a partner could be held liable in a tort action against the partnership, regardless of whether partnership assets were first exhausted in an attempt to satisfy the judgment. In its discussion, the Court said:

> Phillips [the partner-defendant] contends that, in any event, he could not be held liable as an individual because partnership assets must first be used in the payment of partnership liabilities and the individual assets in the payment of individual liabilities, although, concededly a partner's individual

assets may be held for the payment of partnership debts where partnership assets are insufficient.

The principle prevails both at common law and under the Uniform Partnership Act when suit is brought on an alleged contractual obligation of the partnership. [*National*] *Union Bank v.* [*National*] *Mechanics' Bank*, 80 Md. 371, 30 Atl. 913; *Glenn v. Gill*, 2 Md. 1; *McCulloh v. Dashiell's Adm'r*, 1 Harr. & G. 96; Code (1957), Article 73A, § 15(b). The rule is otherwise, however, both at common law and under the Uniform Partnership Act, where the claim is based upon an alleged tortious act committed in the course of the partnership business.

*Id.,* 239 Md. at 223, 210 A.2d 743.

The first sentence of the second paragraph does not mandate a result different from the one we reach here. First, the sentence is obviously *dictum;* while it is worthy of consideration, it is not binding. "*[S]tare decisis* is ill-served if readers hang slavishly on every casual or hurried word as if it had bubbled from the earth at Delphi. *Obiter dicta,* if noticed at all, should be taken with a large grain of salt." *State v. Wilson,* 106 Md.App. 24, 39, 664 A.2d 1, *cert. denied,* 340 Md. 502, 667 A.2d 342 (1995).

Read in context, we do not believe that the *Phillips* Court suggests that a partner is not "liable" on a contractual claim against the partnership in the sense that he or she cannot even be sued until partnership assets have been exhausted. The cases cited by the Court, *National Union Bank v. National Mechanics' Bank, supra,* 80 Md. 371 at 386, 30 A. 913; *Glenn v. Gill, supra,* 2 Md. at 15; and *McCulloh v. Dashiell's Administrator, supra,* 1 H. & G. 96, relate only to the marshalling of assets concept. Thus, we do not construe the decision to preclude suit against a partner in connection with a contractual claim against the partnership until after judgment has been obtained against the partnership and partnership assets are exhausted. That construction would contradict the clear language of C.A. § 9–307(a)(2), which provides that partners are "liable ... [j]ointly" for partnership

contractual debts. Although under the marshalling doctrine, a partner cannot be called upon to *pay* the partnership's contractual debt until exhaustion of partnership assets, that doctrine does not preclude joinder of a partner in a suit against the partnership.

Finally, the Defendants argue that, even if the law authorizes suits against partners and partnerships in the same action, the plaintiff cannot sue SHALP's general partners because the Purchase Agreements precluded personal liability on the part of the partners. The pertinent provision of the Purchase Agreement states:

> The liability of Seller [SHALP], its successors and assigns, *under this Agreement*, shall at all times be limited solely to the assets and property of Seller, and the Purchaser agrees that no partner of Seller shall be personally or individually liable or responsible for the performance of any of Seller's obligations hereunder.

(Emphasis supplied).

The Council counters that, since the provision only shields the partners from liability "under th[e] Agreement," it does not protect the partners from liability arising under the CPA. The Council also contends that the provision is an ineffective attempt to disclaim an express warranty. *See* R.P. § 10-202(c). Moreover, the Council argues that, if the provision is construed as shielding the partners from personal liability, then it violates public policy. We decline to address these contentions, because we ordinarily cannot affirm the entry of summary judgment based on a different ground than the one on which the circuit court relied. *Hoffman v. United Iron and Metal Co., Inc.,* 108 Md.App. 117, 130–31, 671 A.2d 55 (1996); *Warner v. German, supra,* 100 Md.App. at 517, 642 A.2d 239.

While we believe that the better rule permits suit against the partnership as well as its partners, we recognize that there are cases that say otherwise. *See Security State Bank v. McCoy,* 219 Neb. 132, 361 N.W.2d 514 (1985) (interpreting local statute); *Broom v. Marshall,* 284 S.C. 530, 328 S.E.2d

639, 642–43 (1985). We decline to follow them, however. To file one suit against the partnership and a subsequent suit against the partners is hardly an efficient use of resources. Moreover, since the partners might not be bound by the result of the first suit, to which they were not parties, *see Martin v. Wilks*, 490 U.S. 755, 761–63, 109 S.Ct. 2180, 2184–85, 104 L.Ed.2d 835 (1989); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979); *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), the creditor might be required to re-litigate matters that were necessarily considered in the first suit. We do not believe that a creditor should be forced to sue twice in order to collect once. Rather, we believe that these issues may be determined in a single action in which the creditor may sue both the partners and the partnership. Nevertheless, based on the marshalling doctrine, any judgment against the partners must be entered as to liability only, so that the partners' personal assets are shielded from execution until such time as the partnership assets are exhausted or unless it is shown that there can be no effective remedy without resort to the partners' assets.

Accordingly, we hold that the circuit court erred in dismissing the claims against SHALP's general partners.

### VIII. The Defendants' Cross–Appeal

Because we are remanding some of the Council's claims for further proceedings, we must consider the issues raised in the cross-appeal.

### A. Limitations

In Part IV, we determined that the Council's implied warranty claim (Count I) was barred because suit was filed after the expiration of the Tolling Agreement. The Defendants argue that the circuit court should have dismissed the Council's entire complaint, because it was not filed before the expiration of the deadline in the Tolling Agreement. The Defendants' contention is without merit.

The Tolling Agreement, by its terms, applied only to the Council's claim for breach of implied warranty on common elements. Paragraph C of the Tolling Agreement's "Prefatory Statements," which refers only to that warranty, states: "Section 10–203 of the Real Property Article, Annotated Code of Maryland, and Section 11–131(c) of the [Maryland Condominium] Act creates an implied warranty on the common elements from SHALP to the Council." The paragraph then recites the statutory law on the limitations period for implied warranty claims. The Tolling Agreement also provides:

> The parties acknowledge and agree that, unless extended by mutual agreement, *the Council would be required pursuant to Section 11–131(c)(4) of the Act, to bring its suit for enforcement of the common element warranties* on or before December 30, 1991 ("the Limitations Period"). In order that SHALP and the Council may continue their mutual efforts to resolve *all disputes pertaining to the common element warranties*, they have agreed to enter into this Agreement, under the terms and conditions set forth below.

(Emphasis supplied). Finally, the provision of the Tolling Agreement extending the limitations period referred only to the implied warranties: "SHALP agrees to extend the Limitation Period *set forth in Section 11–131(c)(4)* of the Act for a period of one hundred eighty (180) days from the date of the execution of this Agreement." (Emphasis supplied).

It is thus patently obvious that the Tolling Agreement has nothing to do with the limitations periods for the Council's claims for breach of contract, breach of express warranty, or violation of the CPA. Moreover, in the trial court, Defendants did not contend that the whole complaint was untimely. Thus, its claim on this basis is not preserved. Md.Rule 8–131(a).

### B. The Summary Judgments in Favor of Security and Hartford

In order to protect their interests in the event this Court were to reverse the summary judgments in their favor, the

Defendants noted cross-appeals from several unfavorable rulings regarding their claims against third-party defendants Security and Hartford.

**1. The Indemnity and Contribution Claims against Security**

The Defendants' third-party complaint against Security contained three counts: "breach of contract," "professional negligence," and "indemnity/contribution." The trial court found triable issues with respect to the Defendants' breach of contract and professional negligence claims, but entered summary judgment in favor of Security on the indemnity and contribution claims.

"[I]ndemnity implies a shifting of the entire loss from the party who paid the judgment to the tortfeasor [or wrongdoer] who should in fairness bear it." *Board of Trustees of the Baltimore County Community Colleges v. RTKL Associates,* 80 Md.App. 45, 55, 559 A.2d 805 (1989), *cert. dismissed,* 319 Md. 274, 572 A.2d 167 (1990). *See Park Circle Motor Co. v. Willis,* 201 Md. 104, 113, 94 A.2d 443 (1953). Thus, the right to indemnity is premised on the obligations between the wrongdoers, who "must have had some sort of relationship" justifying indemnity. *Id.* Indemnity has also been described as "a right which inures to a person who has discharged a duty which is owed by him but which, as between himself and another, should have been discharged by another." *National Indemnity Co. v. Ryder Truck Rental, Inc.,* 472 So.2d 856, 859 (Fla.Dist.Ct.App.1985).

The indemnity doctrine has been applied in tort cases and in cases in which the indemnitor has breached a warranty of good and workmanlike service. *See Orient Overseas Line v. Globemaster Baltimore, Inc.,* 33 Md.App. 372, 393, 365 A.2d 325 (1976) (maritime law); *Frasca v. S/S Safina E. Ismail,* 413 F.2d 259, 261 (4th Cir.1969). A right to indemnification also may arise based on an express or implied contract or by operation of law. *Hanscome v. Perry,* 75 Md.App. 605, 615–16, 542 A.2d 421 (1988). Here, the Defendants claim that they

are entitled to indemnification through an agreement with Security and by operation of law.

 · The Defendants' allegation of an indemnification agreement rests on an indemnification clause in a document that purports to be a draft contract between SHALP and Security. The Defendants concede that no final, written contract was executed with Security. Carl Maus, the president of Security, testified in a deposition that SHALP and Security drafted a contract for the project, then continued negotiations over changes, but "[d]uring the course of the job . . . it fell through the cracks and everybody just kept working and the contract was never signed." Nevertheless, the Defendants contend that the presence of the indemnification clause in the draft contract raises a factual dispute as to whether Security actually agreed to indemnify SHALP for all losses arising out of the project.

We decline to consider this contention, because it was not asserted below. Md.Rule 8–131(a). In their third-party complaint, the Defendants did not allege that they were entitled to indemnification on the basis of either an express or implied contract. Rather, they only stated a claim of implied-in-law indemnification. The third-party complaint stated, in pertinent part:

44. To the extent that Scarlett [SHALP], Merritt, and/or MOC is/are found liable to the [Council] with respect to the claims asserted by the [Council] in this action, such liability is as a result of the actions and/or omissions of Security, while any alleged wrongdoing on the part of Scarlett, Merritt and/or MOC was, at most passive.

45. Accordingly, Scarlett, Merritt and/or MOC is/are entitled to indemnity from Security with respect to any damages which may be recovered by the Condominium against Scarlett, Merritt and/or MOC . . .

In addition, in its response to Security's motion for summary judgment, the Defendants did not allege a factual dispute as to the existence of an indemnification agreement.

 The Defendants' claim for implied-in-law indemnification is more problematic. Implied-in-law indemnity is "an equitable doctrine that does not lend itself to hard and fast rules." *Zontelli & Sons, Inc. v. City of Nashwauk*, 373 N.W.2d 744, 755 (Minn.1985). But joint tortfeasors or parties that are *"in pari delicto"* may have no right of indemnification. *Baltimore & Ohio Railroad Co. v. County Commissioners of Howard County*, 113 Md. 404, 414, 77 A. 930 (1910); *Baltimore & Ohio Railroad Co. v. Howard County Commissioners*, 111 Md. 176, 185, 73 A. 656 (1909). *See Crockett v. Crothers*, 264 Md. 222, 227, 285 A.2d 612 (1972). The basis for this rule is that "no one should be permitted to found a cause of action on his own wrong." *Stuart v. Hertz Corp.*, 351 So.2d 703, 705 (Fla.1977).

 Nevertheless, a right to indemnification may lie, notwithstanding the parties' joint and several liability, when there is a considerable difference in the degree of fault among the wrongdoers. *Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Authority*, 693 F.2d 1, 2 (1st Cir.1982). The overriding concept is that, when there is a great disparity in the degree of fault among the wrongdoers, liability may be shifted to the party primarily responsible for the loss. This notion has been formulated in various ways. It has been stated that indemnity is available where the party seeking indemnity is only "secondarily" liable, as compared to the other tortfeasor's "primary" liability. *See Pyramid Condominium Association v. Morgan*, 606 F.Supp. 592, 596–97 (D.Md.1985). Similarly, a party may be entitled to indemnity "where he was only technically or constructively at fault, as from a failure to perform some legal duty, and the negligent or wrongful act of the party from whom indemnity is sought was the primary or proximate cause of the injury." 12 MLE *Indemnity* § 6 at 166 (1960), citing *Baltimore & Ohio Railroad, supra*, 111 Md. 176, 73 A. 656 and *Chesapeake & Ohio Canal Co. v. Allegany County Commissioners*, 57 Md. 201, 220–24 (1881). Additionally, in negligence cases, Maryland follows the "active/passive negligence" rule, by which a defendant may be entitled to indemnity if his negligence was only

"passive" while another defendant's negligence was "active." *RTKL Associates, supra,* 80 Md.App. at 54–57, 559 A.2d 805.

Numerous examples may also be found in the case law. An employer who is liable for a tort committed by an employee under the doctrine of *respondeat superior* may, in the absence of active, independent negligence on the part of the employer, recover the full amount of its loss from the employee. *Pennsylvania Threshermen and Farmers' Mutual Casualty Insurance Co. v. Travelers Insurance Co.,* 233 Md. 205, 215, 196 A.2d 76 (1963). Also, where a developer whose property is in violation of the building code has committed no independent negligence, and is required to pay damages solely because of its breach of its nondelegable duty to comply with the code, the developer may obtain indemnification from its independent contractor whose negligence actually caused the breach. *Council of Co–Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.,* 308 Md. 18, 40–41, 517 A.2d 336 (1986). *See also Gardenvillage Realty Corp. v. Russo,* 34 Md.App. 25, 40–41, 366 A.2d 101 (1976) (in case involving injuries to tenant and invitee when a porch collapsed, negligence of residence's owner and builder was "passive" and negligence of supplier of concrete support slab was "active," thus entitling owner and builder to indemnification from supplier).

As we see it, the issue here is whether the wrongs alleged against the Defendants by the Council are passive or secondary wrongs compared to Security's alleged primary or active misconduct. *See RTKL Associates,* 80 Md.App. at 56, 559 A.2d 805. "If the [plaintiff's] complaint alleges conduct that constitutes active [wrongdoing] on the part of the party seeking indemnification, or if it is clear from circumstances revealed in the complaint that liability would only arise from proof of active [wrongdoing], there is no basis for an indemnity claim." *Id.*

The gravamen of the Council's CPA claim is that SHALP falsely told unit purchasers that the Condominium would conform to plans and specifications. This claim focuses not on conduct for which the Defendants were only secondari-

ly or passively liable, but instead on the Defendants' *own* primary, active deception. In other words, the CPA claim attacks the Defendants' wrongful acts in deceiving their customers. If the Defendants are found liable under the CPA on the basis of their own primary, active misconduct, then they would not be entitled to indemnity.

On the other hand, scienter is not required for CPA violations. *See Golt v. Phillips, supra,* 308 Md. at 10–11, 517 A.2d 328. Therefore, to incur liability, the Defendants did not have to know of the falsity of their representations. Nor must they have had the intent to deceive their purchasers in order to violate the CPA. *See id.* If the Defendants stated erroneously and falsely that the Condominiums conformed to plans and specifications, they may have violated the CPA, notwithstanding the fact that their misrepresentations were unintentional.[16] In such a case, they may be able to recover indemnification from a contractor whose faulty work was the primary

---

**16.** The *Golt* rule imposing liability in the absence of scienter should be distinguished from the Court of Appeals's decisions in two lead paint cases: *Scroggins v. Dahne,* 335 Md. 688, 645 A.2d 1160 (1994), and *Richwind Joint Venture 4 v. Brunson,* 335 Md. 661, 645 A.2d 1147 (1994). In both of those cases, the Court held that the leasing of a dwelling with lead-based paint that was not chipped or peeling was not, in itself, a violation of the CPA. *Scroggins,* 335 Md. at 696, 645 A.2d 1160; *Richwind,* 335 Md. at 686, 645 A.2d 1147. In *Richwind,* the Court reached this conclusion by reasoning that a rule imposing CPA liability for lead paint hazards that occurred during the term of the lease would in effect "impose strict liability on landlords throughout the term of the lease." 335 Md. at 684, 645 A.2d 1147.

The Court's avoidance of "strict liability" must be read in context. The basis of the Court's decision in both cases was that the CPA only governs "deceptive trade practices which induce the prospective tenant to enter into ... a lease." *Id.,* 335 Md. at 683, 645 A.2d 1147; *Scroggins,* 335 Md. at 696, 645 A.2d 1160. The CPA does not, however, govern "statements or omissions concerning the leased premises during the term of the lease." *Richwind,* 335 Md. at 683, 645 A.2d 1147; *Scroggins,* 335 Md. at 696, 645 A.2d 1160. Thus, leasing a dwelling with "intact" lead-based paint was not a CPA violation because the lead-paint hazard did not exist at the time the lease was created.

In the case at bar, the Council has alleged that the defendants made false statements in the purchase agreements *to induce* purchasers to buy Condominium units. As such, the statements would be governed by *Golt* and not by *Richwind* or *Scroggins.*

cause of the lack of conformity to plans and specifications and the resulting liability of the Defendants.

The same may be said about the express warranty claim. If Security is found primarily liable for the Defendants' breach of express warranty, while the Defendants are only passively or secondarily liable, then the Defendants may have the right to indemnity from Security.

We thus cannot say that the Defendants cannot recover on their indemnity claim against Security. We conclude that there was a triable issue on the claim, and the circuit court should not have entered summary judgment in Security's favor.

We now turn to the Defendants' contribution claim, to which Security makes no response in its brief. In *RTKL Associates*, we discussed the difference between contribution and indemnity. In essence, contribution is the distribution of loss among culpable parties in accordance with their proportionate shares. It is defined as "a payment made by each, or by any, or several having a common interest of liability of his share in the loss suffered, or in the money necessarily paid by one of the parties in behalf of the others." 5A MLE *Contribution* § 2 at 434 (1982). The doctrine is not based on contract or tort, but instead is a doctrine based on principles of equity. *Lyon v. Campbell*, 324 Md. 178, 182, 596 A.2d 1012 (1991).

Maryland has adopted the Uniform Contribution Among Tortfeasors Act to provide a right of contribution among joint tortfeasors. Md.Ann.Code, art. 50, § 16–24 (1994). But contribution is not limited to tort cases. Instead, it may be applied to cases involving joint contractual obligations or other debts not arising out of tort liability. *Lyon, supra* (tax liability); *Jackson v. Cupples*, 239 Md. 637, 639–40, 212 A.2d 273 (1965); *Mallis v. Faraclas*, 235 Md. 109, 115–16, 200 A.2d 676 (1964).

In order for a party to have a right of contribution, two prerequisites must be satisfied. First, the parties must

share a "common liability" or burden. *Ennis v. Donovan,* 222 Md. 536, 539–40, 161 A.2d 698 (1960), *overruled on other grounds, Lusby v. Lusby,* 283 Md. 334, 390 A.2d 77 (1978); *Baltimore Transit Co. v. State, to Use of Schriefer,* 183 Md. 674, 679, 39 A.2d 858 (1944). Second, the party seeking contribution must have paid, under legal compulsion, more than his fair share of the common obligation. *Associated Transport v. Bonoumo,* 191 Md. 442, 447, 62 A.2d 281 (1948).

Parties share a common liability if they are either co-obligors or joint tortfeasors. *See Jackson v. Cupples, supra,* 239 Md. at 639–40, 212 A.2d 273 (contribution available among joint obligors); Md.Ann.Code, art. 50, § 16 *et seq.* (1994) (contribution available among joint tortfeasors). Parties are co-obligors if they are jointly liable or jointly and severally liable on an obligation. *See Lyon v. Campbell, supra,* 324 Md. 178, 596 A.2d 1012 (tax liability). They are not co-obligors, however, if they are only severally liable on the obligation. *See* 18 C.J.S. *Contribution* § 6 at 8 (1990). The Uniform Contribution Among Tortfeasors Act, Md.Ann.Code, art. 50, § 16(a) (1994), provides: " 'Joint tort-feasors means two or more persons jointly *or* severally liable *in tort* for the same injury to person or property, whether or not judgment has been recovered against all or some of them." (Emphasis supplied). In sum, parties share a common liability if they are either (1) jointly liable on the same non-tort obligation (such as a contract, promissory note, or tax), or (2) jointly or severally liable, or both, in tort, for the same harm.

Whether the Defendants are ultimately entitled to contribution from Security hinges on whether their respective liabilities are in tort or in warranty. As we see it, there are three possible scenarios:

1. If the Defendants are ultimately found liable to the Council for violating the CPA (a tort) *and* Security is found liable to the Defendants on the Defendants' "professional negligence" claim (another tort), then the Defendants would be joint tortfeasors and contribution would be available. The Defendants' and Security's separate torts would result in the

same harm. Joint tortfeasors may share a common liability even when they are each liable to the plaintiff under a different legal theory. *See Svetz v. Land Tool Co.*, 355 Pa.Super. 230, 513 A.2d 403, 408, *aff'd*, 515 Pa. 584, 527 A.2d 544 (1986) (one defendant liable for negligence, another defendant liable under strict liability); *Cartel Capital Corp. v. Fireco of New Jersey*, 81 N.J. 548, 410 A.2d 674, 684 (1980) (same); *Fischbach & Moore International Corp. v. Crane Barge R–14*, 476 F.Supp. 282, 287 (D.Md.1979), *aff'd* 632 F.2d 1123 (4th Cir.1980).

2. If the Defendants are found liable based on the CPA, and Security is found liable to the Defendants on the Defendants' breach of contract claim *only* (and not on the professional negligence claim), then the Defendants would have no right of contribution against Security, because the Defendants and Security would not be joint tortfeasors. *See Baker, Watts & Co. v. Miles & Stockbridge*, 95 Md.App. 145, 188, 620 A.2d 356 (1993) (if liability of parties does not lie in tort, then they are not "joint tortfeasors" within the meaning of the Uniform Contribution Among Tortfeasors Act).

3. If the Defendants are liable for breach of express warranty only, then the Defendants would have no right of contribution from Security. First, Security is not a co-obligor on the Defendants' express warranty. Second, because the Defendants' liability to the Council would not sound in tort, the Defendants and Security would not be joint tortfeasors. Since the parties would be *neither* co-obligors *nor* joint tortfeasors, they would lack a common liability and there would be no right of contribution.

The foregoing illustrates that there could be a situation in which the Defendants could have a right of contribution from Security. Thus, we reverse summary judgment in favor of Security on the Defendants' contribution claim.

## 2. The "Defective Work" Claims against Security

The trial court granted summary judgment on five so-called "defective work" claims asserted by the Defendants

against Security. Specifically, the court ruled that the Defendants could not proceed to trial on issues regarding defects in the following areas of Security's work: improper trimming of flashing, installation of weepholes in the masonry, tears in the flashing, mortar fouling, and improper mortar tooling. The Defendants claim that they presented, in response to Security's motion for summary judgment, competent and admissible evidence that all of those alleged defects were within the scope of Security's work. They contend, therefore, that because the trial court found that the Council had raised triable issues as to these defects, the Defendants should have been permitted to pursue their claims against Security regarding these same defects. We agree.

A third-party complaint, by its nature, is a contingent claim. Such a complaint alleges that, *if* the defendant is found liable to the plaintiff, then the third-party defendant is, in whole or in part, liable to the defendant. Niemeyer & Schuett, MARYLAND RULES COMMENTARY, *supra*, at 224. *See* Md.Rule 2–332(a) (third-party complaint shall be served on "a person not previously a party to the action who is *or may be* liable to the defendant for all or party of a plaintiff's claim ..." [emphasis supplied] ). Thus, when an impleaded party files a motion for summary judgment on the third-party claim, the issue is not whether the defendant is liable to the plaintiff. Rather, the issue is whether there is a genuine dispute of fact on the issue of whether the third-party defendant may be liable to the defendant *if* the defendant is found liable to the plaintiff. The defendant is not required to present evidence of his own liability; he is only required to present sufficient evidence of the third-party defendant's contingent liability.

As we noted earlier, in response to Security's motion, the Defendants presented a draft contract between SHALP and Security. The draft indicated that the masonry work for the Condominium was within the scope of Security's contractual responsibilities. Article 3 of the draft stated:

This scope of work shall include all labor and material required to install masonry work as outlined in the attached

scope of work dated July 25, 1986, and in accordance with the contract documents as listed on the attached drawing list dated 10/28/86.

A "Requisition for Masonry," dated April 29, 1986, stated as the "General Scope of Work":

Provide all necessary labor, materials, tools, equipment, scaffolding, appliances, hoisting, staging, protection, clean-up, taxes, guarantees and other facilities to perform all Masonry Work complete on the above referenced project as shown or implied by the documents and conditions. . . .

The "Additional Conditions" of the requisition contained the following terms:

1. Provide all labor for handling and placing brick and mortar. . . .

\* \* \* \* \* \*

3. Provide all flashing and expansion joint covers associated with masonry work. Deliver shelf angle flashing to the exterior metal framing panel contractor's shop for installation by that contractor.

A document entitled "Masonry Scope of Work," with a handwritten notation stating "Security 11/27" at the top, stated, in pertinent part: "Provide all required accessories, including but not limited to: flashing, reinforcing, wall ties, anchors, weep holes, etc."

The masonry work included trimming of flashing, which was within the scope of Security's contractual responsibilities. The parties agreed that Security trimmed the flashing and installed the weepholes. Because the court found that there was a triable issue on the Council's claim that holes and tears in the flashing allowed water leaks that caused the corrosion of structural steel, there was also a triable issue as to whether Security was liable to the Defendants for defects in its masonry work.

It is no answer to say that the Defendants' experts did not question the quality of Security's work, or that the Defendants could produce no expert testimony attributing any water

infiltration problems to clogged weepholes, mortar fouling, or improper tooling. The Defendants, of course, were proverbially "between a rock and a hard place." They contend that there were no defects in the Condominium. But, in their third-party claim, they assert that, if they are nevertheless liable to the Council based on those defects, then Security is liable to them. Requiring the Defendants to produce evidence of a defect or the cause of water infiltration would be tantamount to requiring the Defendants to make the Council's case. This they did not have to do. All the Defendants needed to do was present evidence that the allegedly defective work was within the scope of Security's responsibilities. As they met that burden, summary judgment was improper.

### 3. The Summary Judgment in Favor of Hartford

Finally, the Defendants contend that the circuit court erred in granting Hartford's motion for summary judgment with respect to holes and tears in the flashing that Defendants claim may be the responsibility of Kraus, Hartford's principal.[17] In response to Hartford's motion, the Defendants presented an affidavit from Dr. David J. Fielding that stated, in pertinent part:

4. ... I have reviewed the documents relating to the contractual relationship between SHALP and the Third–Party Defendant, Leonard A. Kraus, Co., Inc. ("Kraus"), including the Contract dated August 5, 1986 between SHALP and Kraus ("Kraus Contract").

\* \* \* \* \* \*

7. Pursuant to the Kraus Contract, Kraus was required to install flashing on the steel stud panels at the exterior walls, which flashing was supplied and delivered to Kraus by others.

\* \* \* \* \* \*

10. To the extent the Plaintiff is complaining of *punctures, tears or holes in the flashing and to the extent the trier of*

---

**17.** Hartford has not addressed this contention.

*fact determines that this is a construction defect for which SHALP is liable, then, it is my opinion, based upon a reasonable degree of engineering probability, that to the extent that any such tears, holes or punctures occurred during the time period from the time Kraus took possession of the flashing to the time the mason built in the flashing, said damage is the responsibility of Kraus.*

(Emphasis supplied).

The affidavit seeks to raise a factual dispute regarding Kraus's culpability for the holes or tears in the flashing, in the event the Defendants are found liable to the Council. The trial judge, however, rejected the affidavit, saying:

Well that certainly is a statement but it sure doesn't make any sense to me. What it means to me, Mr. Spence [Defendants' co-counsel], is that he is saying that if two little kids with ice picks decide to come on the project after Kraus is finished and they ice pick this flashing to death, then it is still Kraus's responsibility and I just don't see how that can work.

\*　　\*　　\*　　\*　　\*　　\*

I'm of the opinion that that makes no sense and that is not an expert opinion that I should or will accept. It is contrary to the law of warranties and guarantees and all of that sort of stuff.

The same rules that govern whether expert testimony is admissible at trial apply on summary judgment. *See Helinski v. Rosenberg,* 90 Md.App. 158, 166, 600 A.2d 882, *rev'd on other grounds,* 328 Md. 664, 616 A.2d 866 (1992), *cert. denied,* 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993). Rule 5–702, which governs expert testimony, provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert

testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

Generally, "[t]he admissibility of expert testimony 'is a matter largely within the discretion of the trial court and its action will seldom constitute grounds for reversal.' " *Leary v. Leary,* 97 Md.App. 26, 52, 627 A.2d 30 (1993), quoting *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977).

■ The trial judge did not reject the affidavit on the ground that Dr. Fielding was unqualified. *See Helinski,* 90 Md.App. at 167, 600 A.2d 882 ("Whether an expert is qualified to render an opinion is a matter to be determined by [the trial] court. . . ."). Nor did the judge articulate that the expert's opinion lacked a sufficient factual basis. *See Beatty v. Trailmaster Products, Inc.,* 330 Md. 726, 741, 625 A.2d 1005 (1993). Apparently, the trial court rejected the affidavit because he concluded that it averred that Kraus would be liable for *any* holes or tears in the flashing, even if they resulted from acts for which Kraus was not at fault.

We believe that the trial court misread the affidavit. As we stated earlier, a third-party complaint is a contingent claim that alleges that, *if* the defendant is found liable to the plaintiff, then the third party defendant is, in whole or in part, liable to the defendant. Dr. Fielding opined, within a "reasonable" degree of engineering probability, that Kraus would be liable if holes in the flashing resulted from a "construction defect" for which SHALP was found liable, because the installation of the flashing was within the scope of Kraus's contractual obligations. Holes in the flashing caused by children with ice picks would not constitute a "construction defect."

The affidavit should not have been disregarded on the basis asserted by the court. Therefore, we conclude that the trial court erred in granting summary judgment in favor of Hartford with respect to the third-party claim related to holes and tears in flashing.

### *Appeal No. 1*

In Appeal No. 1, Hartford challenges the trial court's denial of its petition to compel arbitration of the Defendants' grievance against it.[18] Our reversal in Appeal No. 2 of certain of the trial court's rulings requires us to consider the issue presented in Appeal No. 1.

Hartford, as we stated earlier, is the surety under a performance bond for Kraus, one of the subcontractors. Kraus and SHALP utilized as their contract the "American Institute of Architects Standard Form of Agreement Between Owner and Contractor." Paragraph 7.9.1 of the contract's General Conditions section was a "broad form" arbitration agreement that provided, in pertinent part:

> All claims, disputes and other matters in question between the Contractor [Kraus] and the Owner [SHALP] arising out of or relating to the Contract Documents or the breach thereof ... shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise.... No arbitration shall include by consolidation, joinder, or in any other manner, parties other than the Owner, the Contractor and any other persons substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration.

---

18. In its brief, Hartford states its "Question Presented" as follows: "Did the trial court err in partially granting Hartford's motion for summary judgment, where there was no evidence to support a judgment against Hartford's principal, Kraus, on those aspects of SHALP's claims which were excluded by the court's order?" But Hartford's brief goes on to argue only the arbitration issue, and does not address any issues relating to its motion for summary judgment (which we previously discussed in the context of the Defendants' cross-appeal in Appeal No. 2).

 We assume that the question presented is simply a mistake, and we shall address the arbitration issue. In any event, we cannot consider any challenge by Hartford to the partial grant of its motion for summary judgment, because Hartford has presented no argument in support of its position. *See* Md.Rule 8-504(a)(5) (a brief must contain "[a]rgument in support of a party's position").

Both parties to this appeal agree that this provision entitled Kraus to require arbitration to resolve any "claims, disputes, [or] other matters ... arising out of or relating to the Contract Documents or breach thereof."

The contract between SHALP and Kraus also required Kraus to obtain a performance bond to guarantee its obligations under the contract. Kraus obtained the required bond from Hartford, which provided, in part:

> **Whereas,** Principal [Kraus] has by written agreement dated 8/12/86 entered into a subcontract with Obligee for Renovation and addition to Scarlett Seed Building—Light Gauge Metal Framing (Scarlett Place Phase II & III) in accordance with drawings and specifications prepared by Meyers & D'Aleo *which subcontract is by reference made a part hereof,* and is hereinafter referred to as the subcontract.

(Italics added).

After the Defendants impleaded Kraus and Hartford, they filed petitions to compel arbitration and stay proceedings against them, based on the arbitration clause in Kraus's subcontract with SHALP. The circuit court granted Kraus's petition but denied Hartford's petition, ruling that the performance bond contract did not contain an arbitration agreement. We agree with the trial court that SHALP could not be required to arbitrate its disputes with Hartford.

The starting point for our analysis is the Maryland Uniform Arbitration Act, codified at C.J. §§ 3–201 to 3–234. C.J. § 3–206(a) makes enforceable written agreements to arbitrate. It states: "A written agreement to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract." The Act also provides mechanisms for a party to enforce an arbitration agreement. C.J. § 3–207(a) provides: "If a party to an arbitration agreement described in § 3–202 refuses to arbitrate, the other party may file a petition with a court to order arbitration." C.J. § 3–207(c), in turn, provides that "[i]f

the court determines that the agreement exists, it shall order arbitration. Otherwise, it shall deny the petition."

 Arbitration is purely a product of contract. *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 103, 468 A.2d 91 (1983). Although arbitration is favored for dispute resolution, *Parr Construction Co. v. Pomer*, 217 Md. 539, 543, 144 A.2d 69 (1958); *International Association of Firefighters, Local 1619 v. Prince George's County*, 74 Md.App. 438, 444, 538 A.2d 329 (1988), and suits to compel arbitration or to enforce arbitration awards are "favored" actions, *Bel Pre Medical Center, Inc. v. Frederick Contractors*, 21 Md.App. 307, 320, 320 A.2d 558, *aff'd*, 274 Md. 307, 334 A.2d 526 (1975), a party cannot be forced to submit a dispute to arbitration if it has not contractually bound itself to do so. *Gold Coast Mall, supra*, 298 Md. at 103, 468 A.2d 91; *Rosecroft Trotting & Pacing Association, Inc. v. Electronic Race Patrol, Inc.*, 69 Md.App. 405, 408, 518 A.2d 137 (1986). Thus, in a proceeding on a petition to order arbitration, the court must first determine whether an agreement to arbitrate exists. *Stauffer Construction Co. v. Board of Education*, 54 Md.App. 658, 664, 460 A.2d 609, *cert. denied*, 297 Md. 108 (1983). If such an agreement does exist, then under C.J. § 3–207(c), the court "shall" order arbitration. If such an agreement does not exist, however, the court "shall" deny the petition. In ascertaining whether there is an agreement between Hartford and SHALP to arbitrate disputes arising out of Kraus's subcontract, we must interpret the performance bond that Hartford issued.

 Performance or surety bonds, as contracts, are construed like other contracts. *State Highway Administration v. Transamerica Insurance Co.*, 278 Md. 690, 699–700, 367 A.2d 509 (1976); *Walsh v. Jefferson Federal Savings & Loan Association*, 216 Md. 131, 137, 139 A.2d 847 (1958); *John McShain, Inc. v. Eagle Indemnity Co.*, 180 Md. 202, 205, 23 A.2d 669 (1942). A fundamental principle of contract interpretation is to ascertain and effectuate the intention of the parties, unless that intention is inconsistent with some established principle of law. *Kasten Construction Co. v. Rod*

*Enterprises, Inc.,* 268 Md. 318, 328, 301 A.2d 12 (1973); *Cadem v. Nanna,* 243 Md. 536, 543, 221 A.2d 703 (1966); *McIntyre v. Guild, Inc.,* 105 Md.App. 332, 355, 659 A.2d 398 (1995); *Heyda v. Heyda,* 94 Md.App. 91, 98, 615 A.2d 1218 (1992). All other rules of contract construction "are simply in aid of this cardinal rule." *Bentz v. Mutual Fire, Marine & Inland Insurance Co.,* 83 Md.App. 524, 538, 575 A.2d 795 (1990).

 The primary source for determining the intention of the parties is the language of the contract itself. *Shillman v. Hobstetter,* 249 Md. 678, 688–89, 241 A.2d 570 (1968); *Brown v. Fraley,* 222 Md. 480, 489, 161 A.2d 128 (1960). Because Maryland follows the "objective" law of contracts, the court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated. *Faw, Casson & Co. v. Everngam,* 94 Md.App. 129, 134–35, 616 A.2d 426 (1992), *cert. denied,* 330 Md. 155, 622 A.2d 1195 (1993). *See Beckenheimer's, Inc. v. Alameda Associates Limited Partnership,* 327 Md. 536, 547, 611 A.2d 105 (1992). Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed. *Board of Trustees of State Colleges v. Sherman,* 280 Md. 373, 380, 373 A.2d 626 (1977); *Devereux v. Berger,* 253 Md. 264, 269, 252 A.2d 469 (1969); *Bernstein v. Kapneck,* 46 Md.App. 231, 244, 417 A.2d 456 (1980), *aff'd,* 290 Md. 452, 430 A.2d 602 (1981). In such a case, "the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985). "[T]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean." *Board of Trustees of State Colleges v. Sherman,* 280 Md. 373, 380, 373 A.2d 626 (1977).

Hartford relies on the fact that the bond incorporates by reference the contract between Kraus and SHALP, which contains an arbitration clause. But Hartford ignores that, even if that arbitration clause were incorporated into its bond, it only requires arbitration of disputes between *Kraus* and SHALP, not Hartford and SHALP. When an earlier document is "incorporated by reference" into a subsequent contract, it simply means that the earlier document is made a part of the second document, as if the earlier document were fully set forth therein. *See Wheaton Triangle Lanes, Inc. v. Rinaldi,* 236 Md. 525, 531, 204 A.2d 537 (1964); *Ray v. William G. Eurice & Bros.,* 201 Md. 115, 128, 93 A.2d 272 (1952). *See also* BLACK'S LAW DICTIONARY 766–67 (6th ed.1990) (defining "incorporation by reference"). Absent an indication of a contrary intention, the incorporation of one contract into another contract involving different parties does not automatically transform the incorporated document into an agreement between the parties to the second contract.

Hartford further contends that the incorporation of Kraus's subcontract into the bond "clearly" shows that the parties intended that claims under the bond would be decided in arbitration. We disagree. In our view, Kraus's subcontract was incorporated simply to establish the primary obligation on which Hartford's secondary obligation would depend. "[T]he liability of the surety is ordinarily measured by the liability of the principal, and cannot exceed it." 74 Am.Jur.2d *Suretyship* § 25 at 28 (1974). The bond made Kraus's non-performance of the subcontract a condition for Hartford's liability, as it stated: "the Condition of this Obligation is such that, if Principal shall promptly and faithfully perform this subcontract, this obligation shall be null and void; otherwise it shall remain in full force and effect." If Kraus failed to perform its contract, "promptly and faithfully," then Hartford was obligated under the bond. If, on the other hand, Kraus performed its contract, then Hartford's obligations would become "null and void."

Hartford's analogy to our decision in *District Moving & Storage Co., Inc. v. Gardiner & Gardiner, Inc.,* 63 Md.App. 96,

492 A.2d 319 (1985), *aff'd per curiam sub nom. District Moving & Storage, Inc. v. Fedco Systems, Inc.*, 306 Md. 286, 508 A.2d 487 (1986), is misplaced. In *District Moving*, we held that a third-party beneficiary of a contract was bound by an arbitration clause in the contract. In reaching that conclusion, we quoted Professor Williston's statement that "[w]here the contract contains an arbitration clause which is legally enforceable, the general view is that the beneficiary is bound thereby to the same extent that the promisee is bound." *Id.*, 63 Md.App. at 102–03, 492 A.2d 319, quoting WILLISTON ON CONTRACTS § 364A (3rd ed.1957). But a critical factor in *District Moving* was that the arbitration clause at issue was in the very contract under which the plaintiff brought its claim. We thus concluded that the beneficiary should not be able to sue for breach of contract and simultaneously disavow a term of the contract that required submission of disputes to arbitration. *Id.*, 63 Md.App. at 104, 492 A.2d 319.

Here, SHALP has not filed its third-party claim against Hartford under the contract which contained the arbitration agreement. Nor does this case involve a third-party beneficiary of that contract. Instead, SHALP brought its claim under a *separate* agreement that contains no arbitration clause. Therefore, Hartford cannot compel SHALP to submit this claim to arbitration.

 Moreover, the bond actually indicates an intention to *litigate* disputes. Specifically, the bond has an express provision covering the institution of suits under the guarantee: "Any *suit* under the bond must be instituted before the expiration of two years from the date on which final payment under the subcontract falls due." (Emphasis supplied). Hartford's interpretation would have the effect of reading this provision out of the contract. Such a construction would conflict with the settled principle that a contract should not be interpreted in a manner in which a meaningful part of the agreement is disregarded. *See Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 330 Md. 758, 782, 625 A.2d 1021 (1993);

*Arundel Federal Savings & Loan Association v. Lawrence,* 65 Md.App. 158, 165, 499 A.2d 1298 (1985).

Hartford also contends that policy considerations mandate arbitration of SHALP's claim. It first argues that the effect of granting Kraus's petition to compel arbitration but denying Hartford's "is to expose the surety and the principal to different, and potentially inconsistent findings: one at arbitration and one in circuit court." It adds that this "could yield anomalous and illogical results," such as where an arbitrator finds that Kraus did not breach its contract while a jury (in the claim against Hartford) finds that it did. But this situation would simply be the result of the contract to which Hartford agreed. Hartford could have inserted a provision into the bond that, when a claim against a principal is submitted to arbitration, the claim against Hartford must also be arbitrated. As it did not do so, we cannot insert such a provision under the guise of construction. As we observed earlier, courts cannot re-write the plain language of a contract to correct the parties' mistakes or to avoid a harsh result. *See Canaras v. Lift Truck Services, Inc., supra,* 272 Md. at 350, 322 A.2d 866.

> [P]ersons are only bound by the contracts they make, and are not bound by the contracts they do not make.... One may not be required to do what he did not promise merely because what he did promise was not sufficient to meet the requirements of some real or supposed public policy.

*Mayor and City Council of Baltimore, for Use of Lehigh Structural Steel v. Maryland Casualty Co.,* 171 Md. 667, 672–73, 190 A. 250 (1937).

Furthermore, the risk of "inconsistent" results is a product of a system under which courts and arbitrators exist as parallel forums for dispute resolution. In *Chas. J. Frank, Inc. v. Associated Jewish Charities,* 294 Md. 443, 459, 450 A.2d 1304 (1982), the Court held that "ordinarily arbitration should *not* be stayed in order to prevent the prospect for duplicative proceedings with the potential for inconsistent results created

by the voluntary actions of a complaining party." (Emphasis supplied).

Hartford also argues that, "if [the] surety is precluded from insisting upon arbitration, then the arbitration clause in the underlying contract would be rendered meaningless, for the obligee could always circumvent it by bringing suit against the surety directly." Again, we disagree. The parties to the underlying contract have the right to insist on arbitration of their disputes. Far from being a "circumvent[ion]" of the original agreement, SHALP's suit against Hartford is an independent claim that is based on a contract separate from its contract with Kraus; nothing in the performance bond indicates that SHALP is required to pursue Kraus in the same suit in which it sues Hartford. *Cf. General Motors Acceptance Corp. v. Daniels, supra,* 303 Md. at 259, 492 A.2d 1306 ("Ultimate liability" on contract of surety "rests upon the principal obligor rather than the surety, but the obligee has remedy against both."); *Glens Falls Insurance Co. v. Baltimore County for Use and Benefit of Dyer,* 230 Md. 524, 532, 187 A.2d 875 (1963) (mere forbearance by creditor to sue principal, or lack of diligence, will not discharge the surety). A direct suit against Hartford is perfectly permissible under the contract to which Hartford agreed.

We are mindful that a majority of the decisions from other jurisdictions reaches a different result.[19] *See Henderson Investment Corp. v. International Fidelity Insurance Co.,* 575 So.2d 770 (Fla.Dist.Ct.App.1991); *Bolingbrook Park District v. National–Ben Franklin Insurance Co. of Illinois,* 96 Ill. App.3d 26, 51 Ill.Dec. 327, 329, 420 N.E.2d 741, 743 (1981); *Thomas O'Connor & Company v. Insurance Co. of North America,* 697 F.Supp. 563, 564–65 (D.Mass 1988); *J & S Construction Co., Inc. v. Travelers Indemnity Co.,* 520 F.2d 809 (1st Cir.1975). These opinions, however, do not indicate whether the bonds at issue contained an express provision

---

19. While there are cases from other jurisdictions that reach the same result that we do, they do not necessarily employ the same reasoning that we have employed. *See Aetna Casualty & Surety Co. v. Jelac Co.,* 505 So.2d 37 (Fla.Dist.Ct.App.1987); *Maryland Casualty Co. v. State Dept. of General Services,* 489 So.2d 57 (Fla.Dist.Ct.App.), *rev. dismissed,* 494 So.2d 1151 (Fla.1986).

regarding the institution of suit, as does the Hartford bond. To the extent that those decisions take a different view of the effect of the bond's incorporation by reference of the construction contract, we decline to follow them. "We would be remiss in our duty if we declined to question a view held by the majority of jurisdictions simply because it is held by a majority." *Kendall v. Ernest Pestana, Inc.*, 40 Cal.3d 488, 220 Cal.Rptr. 818, 828, 709 P.2d 837, 847 (1985). Therefore, we hold that the circuit court correctly denied Hartford's motion to compel arbitration and stay proceedings.

*IN APPEAL NO. 1:*

ORDER DENYING PETITION TO COMPEL ARBITRATION AND STAY PROCEEDINGS AFFIRMED.

*IN APPEAL NO. 2:*

*ON THE COUNCIL'S APPEAL:*

SUMMARY JUDGMENT ON COUNT IV (MARYLAND CONSUMER PROTECTION ACT) REVERSED.

SUMMARY JUDGMENT ON COUNT III (BREACH OF CONTRACT) AFFIRMED.

SUMMARY JUDGMENT ON COUNT II (BREACH OF EXPRESS WARRANTY) REVERSED.

ORDER GRANTING MOTION TO STRIKE AFFIDAVIT OF GERALD DALRYMPLE NEITHER AFFIRMED NOR REVERSED.

SUMMARY JUDGMENT ON CLAIMS INVOLVING ELEVATOR SHAFT HEATING AND PONDING IN THE VICINITY OF THE FRONT LOBBY ENTRANCE AFFIRMED.

SUMMARY JUDGMENT ON CLAIM INVOLVING DEFECTIVE HVAC APPARATUS REVERSED.

SUMMARY JUDGMENT ON CLAIM REGARDING TELEPHONES AND CABLES REVERSED.

SUMMARY JUDGMENT ON PLAZA DECK CLAIM VACATED.

SUMMARY JUDGMENTS IN FAVOR OF MEYERS, D'ALEO, MERRITT, AND MERRITT OPERATIONS CORPORATION REVERSED.

*ON THE CROSS–APPEAL OF SHALP, MERRITT, AND MERRITT OPERATIONS CORPORATION:*

ORDER DENYING MOTION TO DISMISS IMPLIED WARRANTY CLAIM REVERSED.

CASE REMANDED WITH INSTRUCTIONS TO DISMISS THE IMPLIED WARRANTY CLAIM. SUMMARY JUDGMENT IN FAVOR OF SECURITY MASONRY ON INDEMNIFICATION, CONTRIBUTION, AND FIVE "DEFECTIVE WORK" CLAIMS REVERSED.

SUMMARY JUDGMENT IN FAVOR OF HARTFORD ON DEFECTIVE FLASHING ISSUE REVERSED.

CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE ASSESSED AS FOLLOWS: ONE–THIRD TO SCARLETT PLACE RESIDENTIAL CONDOMINIUM, INC.; ONE–THIRD TO SCARLETT HARBOR ASSOCIATES LIMITED PARTNERSHIP, MERRITT, AND MERRITT OPERATIONS CORP.; ONE–SIXTH TO SECURITY MASONRY; ONE–SIXTH TO HARTFORD.